## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **U. S. SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | |
| **v.** | : | **No. 5:24-cv-1560** |
| | : | |
| **CHARLES E. JONES,** | : | **JURY DEMANDED** |
| | : | |
| **Defendant.** | : | |
| | : | |
| _____ | : | |

### COMPLAINT

Plaintiff United States Securities and Exchange Commission alleges:

1.      Charles E. Jones, while CEO of FirstEnergy Corp. ("FirstEnergy"), made misrepresentations and omissions to the investing public about FirstEnergy's payments to Larry Householder. In early 2017, Householder was a member of the Ohio House of Representatives and a former Speaker of the chamber. FirstEnergy is a large public utility that provides electricity throughout Ohio and beyond. From March 2017 through March 2020, FirstEnergy—with Jones's active participation—engaged in a corrupt scheme to directly and indirectly pay Larry Householder about $60 million.

2.      In July 2020, Householder was indicted in connection with FirstEnergy's payments. In response, Jones told the public that "FirstEnergy acted ethically in this matter" and "transparently."

3.      That wasn't true. FirstEnergy's tens of millions of dollars in payments to Householder were ***unethical***, because Jones and FirstEnergy intended that the money would incentivize the Speaker to champion FirstEnergy's desired legislation loaded with benefits for the energy utility, among other goals.

4.      Jones's public statements were also inaccurate because FirstEnergy ***was not transparent*** about its payments to Householder. On the contrary, all of that money was funneled through 501(c)(4) groups. As one internal FirstEnergy document explained, such "(c)(4)" groups could give "dark money"—so named because the donor was "not required to disclose where the donations are from." Jones approved FirstEnergy's creation of one such dark money group. Householder created one too. Those (c)(4) entities paved the way for tens of millions of dollars to secretly travel from FirstEnergy to Householder.

5.      Jones also misled FirstEnergy's auditor by failing to disclose the payments, and by misrepresenting to the auditor that he was unaware of FirstEnergy's violations of the law during the relevant period. Jones aided and abetted FirstEnergy's failure to devise and maintain internal accounting controls that prevented such malfeasance. He also aided and abetted the

misrepresentations and omissions made by FirstEnergy in an SEC filing.

6.      The SEC brings this civil law enforcement action to hold Jones accountable for his violations of the federal securities laws.

## JURISDICTION AND VENUE

7.      The SEC brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

8.      This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1331.

9.      Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Acts, practices and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Northern District of Ohio and elsewhere.

10.     Defendant directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices and courses of business alleged herein, and will continue to do so unless enjoined.

**DEFENDANT**

11.     **Defendant Charles E. Jones**, age 68, is a resident of Akron, Ohio. From 2015 until 2020, he served as the chief executive officer and president of both FirstEnergy Corp. and FirstEnergy Service Company.

**OTHER RELEVANT ENTITIES AND INDIVIDUALS**

12.     **FirstEnergy Corp.** ("FirstEnergy") is a public utility holding company incorporated in Ohio with its principal place of business in Akron, Ohio. Shares of the company's stock are registered pursuant to Section 12(b) of the Exchange Act and trade on the New York Stock Exchange under the ticker "FE."

13.     FirstEnergy was the parent company to an entity formerly known as **FirstEnergy Solutions** ("FES"). As of November 16, 2016, FES was governed by an independent board of directors. Even after FES officially separated from FirstEnergy, however, FirstEnergy and Jones exerted significant influence over FES and its officers. On March 31, 2018, FES filed for Chapter 11 bankruptcy protection. It is now known as Energy Harbor Holdings LLC.

14.     Throughout the relevant period, **FirstEnergy Service Company** ("FirstEnergy Service") was a wholly owned subsidiary of FirstEnergy. FirstEnergy Service provided financial and other corporate support services to FirstEnergy and its subsidiaries. Between 2017 and March 2020, FirstEnergy Service directly or indirectly paid about $60 million to "Generation Now." During that same period, Jones served as president and chief executive officer

4

of FirstEnergy Service.

15.     **Larry Householder**, age 65, is in federal custody at the federal correctional facility in Lisbon, Ohio. From 1997 to 2004, and then again from 2016 to 2020, Householder represented District 72 in the Ohio House of Representatives. He was elected by a majority of his peers to serve as the Speaker of the Ohio House, first from 2001 to 2004, then again from 2019 to 2020. As Speaker, Householder led the Ohio House of Representatives, creating the chamber's agenda and deciding which bills reached the House floor for a vote. On March 9, 2023, a federal jury convicted Householder of leading a racketeering conspiracy to accept bribes, including from FirstEnergy.

16.     **Generation Now, Inc.** ("Generation Now"), incorporated in Delaware, is a self-described not-for-profit 501(c)(4) social welfare organization that was controlled by Householder.

17.     **Partners for Progress, Inc**. ("Partners for Progress"), incorporated in Delaware on February 6, 2017, was a self-described not-for-profit 501(c)(4) social welfare organization. Although Partners for Progress appeared to be an independent 501(c)(4) entity, it was controlled by Jones and other certain FirstEnergy executives and lobbyists. FirstEnergy was Partners for Progress' sole source of funding and directed its payments to entities associated with public officials.

## FACTS

18.     FirstEnergy and its subsidiaries transmit, generate, and distribute electricity to more than six million customers in Ohio, Pennsylvania, West Virginia, Maryland, New Jersey and New York. FirstEnergy's utility operating companies collectively comprise one of the country's largest investor-owned electric systems.

19.     In 2016, FirstEnergy reported a negative outlook for its energy generation business. In FirstEnergy's 2016 Form 10-K, filed in February 2017, the company reported over $6 billion in losses, particularly from its nuclear energy affiliate. The outlook for its nuclear energy affiliate was bleak, with "substantial uncertainty" about the affiliate's "ability to continue as a going concern[.]"

20.     FirstEnergy had sought legislative solutions to save its nuclear power plants, both at the federal level and in the Ohio legislature, without success. When that failed, FirstEnergy decided to secretly bankroll Householder's return to the Speakership; then to make secret payments to Householder while he pushed legislation loaded with subsidies and other benefits for the utility; and later to clandestinely fund Householder's efforts to extend his Speakership by over a decade.

21.     Here's how the scheme worked:

**Step One: Create "Partners for Progress"**

22.     In January 2017, Householder traveled with Jones on FirstEnergy's private jet. Weeks later, FirstEnergy executives directed the formation of "Partners for Progress," which they styled as a tax exempt 501(c)(4) organization. "501(c)(4)" ("C4" for short) refers to the section of the Internal Revenue Code that codifies tax exemptions for certain social welfare organizations.

23.     Partners for Progress was controlled in part by two FirstEnergy executives, Jones and FirstEnergy Executive A, who handpicked its directors and served as its financial backer. It was incorporated in Delaware rather than Ohio. Under Delaware law, the public had limited visibility into the entity's background and financial backers. That's how FirstEnergy wanted it. As an internal FirstEnergy presentation at the time put it, the company's "preferred manner of giving is through section 501(c) groups, as these are considered 'dark money' because they are not required to disclose where the donations are from."

**Step Two: Use Partners for Progress to Conceal FirstEnergy
as the Source of Payments to Householder-Controlled Entity**

24.     Once Partners for Progress was up and running, FirstEnergy secretly funneled Householder almost $3 million for the Speakership race. A third of that sum was sent on a circuitous journey, originating at FirstEnergy's subsidiary, FirstEnergy Service, stopping briefly at Partners for Progress, before

arriving at "Generation Now," itself a self-styled 501(c)(4) entity controlled by and for the benefit of Householder.

25.    In March 2017, FirstEnergy Executive A received an email describing Generation Now as "the organization that Chuck [Jones] and Larry [Householder] discussed." FirstEnergy Executive A directed FirstEnergy to begin making payments to Generation Now: "Let's do $250,000 asap and we will do $1M by year-end 2017."

26.    In March 2018, Jones and Householder met to discuss the Speakership race. Four days later, FirstEnergy caused $300,000 to be wired from Partners for Progress to Generation Now.

27.    In August 2018, Jones asked FirstEnergy Executive A whether Householder was "looking for more money." "You know the answer to the Householder question," FirstEnergy Executive A responded, "but I don't know for how much he'll ask." After Jones and Householder met a few days later, FirstEnergy caused $500,000 to be wired from Partners for Progress to Generation Now.

28.    Later that month, Householder boasted in a text to Jones how he had championed FirstEnergy's cause during a presidential roundtable. "Thanks for the help!" Jones texted back. "Thank you for your help," Householder replied. "We are rooting for you and your team!" said Jones. Householder responded in kind: "I'm rooting for you as well…we are on the same team."

29.    In early October 2018—with an election rapidly approaching—

Jones knew of an upcoming meeting between FES representatives and Householder. Jones also knew that during the meeting FES representatives would be presenting Householder with a $400,000 check. In his text to FirstEnergy Executive A, Jones conveyed a sense of urgency: "They better get it done quick or he won't be able to spend it." After the meeting, Householder texted Jones: "$400k…thank you." Bank records show that a $400,000 check from FES was cashed by Generation Now on October 16, 2018.

30.     FirstEnergy's money and Jones's efforts paid off. On January 7, 2019, Householder was elected Speaker of the Ohio House of Representatives. That very day he texted Jones: "Thank you for everything it was historical."

### Step Three: Speaker Householder, Powered By Jones and FirstEnergy, Champions Their Cause in Columbus

31.     As soon as Householder regained the Speakership, he worked with Jones and others at FirstEnergy drafting the utility's desired legislation.

32.     The result was House Bill 6 (HB 6), which Householder introduced in the Ohio House in April 2019—three months after he became Speaker. If passed, HB 6 would lock in subsidies for FirstEnergy's Ohio electric distribution subsidiaries, guaranteeing the utility fixed streams of revenue for years to come. The legislation would also authorize FirstEnergy to impose a surcharge on its customers if its annual revenues fell below a baseline amount. And the legislation would empower the Speaker to select three of the 13 members of the state authority that dispersed subsidies to FirstEnergy.

33.     HB 6 passed the House on May 29, 2019; passed the Ohio Senate soon thereafter; and was signed into law by the governor on July 23, 2019. Jones was jubilant: "We made a bbiiiiiiiig bet and it paid off," he texted FirstEnergy Executive A. "You should call the Speaker today," FirstEnergy Executive A suggested. "Already texted him," Jones replied.

34.     Almost immediately, opponents of the legislation launched a campaign to repeal it through a ballot initiative. Opponents had 90 days to gather enough signatures to repeal HB 6. Jones and FirstEnergy responded by facilitating secret payments to Householder in exchange for his promise to beat back the repeal initiative.

35.     After HB 6 was signed into law, FirstEnergy Executive A texted Jones: "Chuck – we're going to need some C(4) infusion." So in early October 2019, Jones directed FirstEnergy to send millions Householder's way. Ultimately, FirstEnergy sent $13 million to Householder for the repeal effort. It changed hands in secret, moving through FirstEnergy's Partners for Progress to Householder's Generation Now. Householder and his team implemented a plan to preserve the bailout by, among other things, using Generation Now funds on an anti-repeal media strategy, and sending mailers urging voters not to sign the petition. Generation Now funds were also used to bribe a manager of the signature-collection effort for inside information and hire private investigators to track signature collectors to harass and intimidate them.

36.     As the deadline for collecting signatures for the ballot initiative

approached, Jones updated his FES counterpart about his talks with "the big guy," including "about raising him $$$$." The millions paid to Householder paid off. Opponents failed to collect enough signatures and the repeal efforts failed. On January 22, 2020, Householder texted Jones a link to an article citing the failed referendum attempt. Householder stated: "We win again." "Great news," Jones responded.

### Step Four: Support Householder's Attempts to Extend His Speakership

37.    In February 2020, Householder called Jones. Householder explained that he was launching a ballot initiative which, if successful, would allow him to serve in the Ohio House—including as Speaker— through 2037. Predictably, Householder wanted FirstEnergy to finance the effort. "Talked to Speaker today," Jones relayed in a text, "He's an expensive friend. 😄"

38.    The next day Jones texted Householder, telling the Speaker he was developing a plan "to do 2 early next week." Householder was grateful: "Very much appreciated." True to Jones's word, on March 3, 2020, Partners for Progress wired $2 million to Householder—routed through the 501(c)(4) entities, thus avoiding detection by the public. For FirstEnergy, the payment was easily and eagerly justified. As FirstEnergy Executive A put it, the initiative would "extend[ ] and stabilize[ ] existing leadership—good for the home team."

**The Scheme Is Exposed;**
**Indictments Follow**

39.     All told, between March 2017 and March 2020, FirstEnergy directly and indirectly paid Householder and his enterprise close to $60 million. All of which explains why, during that timeframe, Householder's team took to calling the utility "the bank." In one recorded call, a Householder associate explained that FirstEnergy earned that handle because it "can fund these things for 20 years if they want to… They've got too much money, too much power." The associate further boasted that FirstEnergy's largesse was seemingly "unlimited"; Householder could count on "the bank" to cut him $1.5 million and $2 million checks with ease.

40.     In July 2020, Householder was arrested and charged with leading a racketeering conspiracy to receive $60 million in bribes to pass and uphold a billion-dollar nuclear plant bailout for FirstEnergy.

**FirstEnergy's and Jones's Coverup**

41.     In the fallout that followed, Jones and FirstEnergy made multiple false statements to hide their involvement in the alleged conspiracy.

42.     On July 23, 2020, FirstEnergy filed a Form 8-K with the SEC. That filing included a press release about the indictment, in which Jones stated: "I believe that FirstEnergy acted ethically in this matter. At no time did our support for Ohio's nuclear plants interfere with or supersede our ethical obligations to conduct our business properly."

43.     During a July 24, 2020 earnings call, Jones addressed the emerging Householder scandal:

> "I believe that FirstEnergy acted properly in this matter and we intend to cooperate fully with the investigation . . ."

> "[L]et me be clear[,] at no time[,] does our support for nuclear plants in Ohio interfere or supersede our ethical obligations to conduct our business properly."

> "I can tell you this, in every meeting, every phone call, every text message that I participate in, I've talked about our obligations to conduct our business transparently, ethically, professionally. I have no worries that I did anything that wasn't that way. And we let the merits of our arguments carry the day when we are operating in the political environment."

44.     Contrary to his July 23 and 24 statements, Jones knew that FirstEnergy and he had acted unethically, and not transparently.

45.     *Lack of Transparency*. Contrary to what Jones told the public, Jones knew there was nothing "transparent" about how FirstEnergy structured or operated Partners for Progress. Rather, the benefit of C4 entities like Partners for Progress was—in the words of a FirstEnergy presentation—that "they are not required to disclose where the donations are from." Thus, there was nothing transparent about secretly paying tens of millions of dollars in what FirstEnergy itself called "dark money" through C4 entities. Far from acting transparently, FirstEnergy's express purpose in creating the C4 was to make millions in payments to Householder *in secret*—that is, without having to disclose such payments to the public.

46.     Consider FirstEnergy Executive A's January 2017 email about the selection of Partners for Progress's directors: "I'd prefer they not be easily identified with FE," he candidly acknowledged to an outside attorney who was helping FirstEnergy incorporate the entity. A few months later, when FirstEnergy was preparing to make its first contribution, a FirstEnergy employee admonished their colleagues: "It's key this money is paid to the c4 so that it doesn't have to be disclosed." Soon thereafter, FirstEnergy made its first such payment to Householder, with Householder's C4 serving as an intermediary. It wasn't until after Householder was indicted that the payment was publicly disclosed.

47.     ***Unethical Misconduct***. Jones knew that FirstEnergy made the tens of millions of dollars in direct and indirect payments to Householder with the improper and unethical goal of influencing the Speaker to, first, ensure passage of HB 6 and, second, to ensure defeat of the ballot initiative.

48.     Jones's July 2020 misrepresentations to the public—that FirstEnergy at all times acted "ethically" and "transparently"— doubled-down on his and FirstEnergy's underlying unethical and secretive misconduct.

### Jones's Misrepresentation About His Coordination with FES

49.     Jones made other material misrepresentations during the July 24 earnings call. Regarding FES, he stated:

> "FES separated fiduciarily, financially and operationally from being a part of FirstEnergy. They put in place an

14

> independent board and from November '[20]16, I've had
> no input into any of the decisions they've made."

> "We were not involved in any way in the decisions made
> by FES."

50.    That wasn't true. Even after the formal separation between FES and FirstEnergy in late 2016, Jones continued regularly coordinating with FES executives, including by directing FES payments to Generation Now.

51.    Once the legislation was introduced, Jones pressured FES to finance Generation Now's ad campaign promoting HB 6. In exchange, Householder promised to help enact HB 6 into law and to inoculate the legislation against any repeal efforts. In late April 2019, Householder texted Jones about HB 6 attack ads that had been funded by opposition groups. Jones texted: "I will be pushing FES to engage." Householder responded: "I asked [Individual 1] to make ads this morning." Jones responded: "I'll talk to FES tomorrow about paying for them." A day later, on April 24, 2019, Jones texted Householder again: "Spoke to FES creditor rep. They will step in and help."

52.    Similarly, in October 2019, Jones struck a deal with FES: FirstEnergy would pay Householder $10 million in return for the Speaker's efforts to fight the HB 6 repeal effort. In return, upon its emergence from bankruptcy, FES would give FirstEnergy certain benefits as part of a real estate transfer. On Thursday, October 17, 2019, one of Householder's advisors made an urgent plea for an immediate $3 million payment to Generation Now, "to get through the weekend." Jones wanted FES to pay the $3 million, but was

advised that FES couldn't do so because it had not yet emerged from bankruptcy. So Jones reluctantly agreed for FirstEnergy to front the money. "Give them the $3M," Jones made clear, "but tell [FES Executive A] I want an IOU."

53.     All of which establishes that Jones lied when he assured the public he was "not involved in any way in the decisions made by FES." On the contrary, Jones and his FES counterpart closely coordinated FirstEnergy's and FES's payments to maximize the effect of such giving.

54.     Both FirstEnergy's secret payments, and Jones's misrepresentations and omissions about them, would have been important to FirstEnergy's investors. Such payments—and the misrepresentations and omissions that followed—cast doubt on the integrity and judgment of FirstEnergy's management, including Jones, and exposed both the company and its CEO to criminal and civil liability. The amount of the payments themselves was also quantitatively significant and was material. Take the fourth quarter of 2019, when FirstEnergy reported $111 million in losses. During that same reporting period, the company facilitated $20 million in secret payments to Partners for Progress, $15 million of which was passed on to Householder.

<b>Jones Executed False Certifications<br>for FirstEnergy SEC Filings</b>

55.     As FirstEnergy's CEO, Jones was responsible for devising and maintaining its internal control over financial reporting. In that capacity he also

reviewed, approved, signed, and certified FirstEnergy's annual report filed for
fiscal year 2019.

56.     FirstEnergy's 2019 annual report was filed on February 20, 2020
and included the following disclosure: "Management is responsible for
establishing and maintaining adequate internal control over financial
reporting…." Jones signed the 2019 Form 10-K, affirming his responsibility for
devising and maintaining internal control over financial reporting.

57.     As part of Jones's certification of the 2019 Form 10-K, he made
the following misrepresentation:

> The registrant's other certifying officer and I have disclosed,
> based on our most recent evaluation of internal control over
> financial reporting, to the registrant's auditors and the audit
> committee of the registrant's board of directors (or persons
> performing the equivalent functions):… any fraud, whether or
> not material, that involves management or other employees who
> have a significant role in the registrant's internal control over
> financial reporting.

58.     This was false. When Jones signed that certification he knew
about the scheme to funnel secret payments through Partners for Progress. But
he chose to hide such payments from the public in FirstEnergy's SEC filings.

### Jones Misled FirstEnergy's Auditor

59.     Jones also hid the scheme from FirstEnergy's auditor. On
February 10, 2020, Jones signed a management representation letter to
FirstEnergy's auditor in which he represented: "There have been no violations
or possible violations of laws or regulations whose effects should be considered

for disclosure in the consolidated financial statements or as a basis for recording a loss contingency."

60.    That wasn't true. Jones never disclosed the ongoing scheme to the auditor, which involved a related party, Partners for Progress. The payments to Partners for Progress should have been considered for disclosure in the financial statements pursuant to generally accepted accounting principles (GAAP) under Accounting Standards Codification 850, entitled "Related Party Disclosures." Jones was not only *aware* of these payments; he *authorized* them, and partly controlled Partners for Progress.

**Jones Failed to Devise and Maintain a
Sufficient System of Internal Accounting Controls**

61.    FirstEnergy's code of business conduct provided that "Company assets and funds may be used only for legitimate business purposes and may never be used for illegal purposes," and that employees should not "knowingly cause corporate funds to be used for unlawful purposes or for purposes other than those described by the documentation supporting payment."

62.    FirstEnergy's corporate political activities policy stated that "where permitted by law and with the approval of our External Affairs Department, FirstEnergy may use corporate funds for the payment of dues and/or contributions to… section 501(c)(4) organizations…" This policy added that FirstEnergy's external affairs department "will review the request to confirm that the proposed contribution or expenditure is in the best interests of

FirstEnergy and, working with the FirstEnergy Legal Department, confirm that any contribution or expenditure we consider complies with applicable election laws, rules and regulations."

63.     Jones substantially assisted FirstEnergy's failure to devise and maintain sufficient internal accounting controls. As CEO of FirstEnergy, Jones was charged with ensuring that FirstEnergy devised and maintained a system of internal accounting controls that provided reasonable assurances that company funds were being used for purposes in accordance with management's authorization.

64.     Notwithstanding this responsibility, Jones directed FirstEnergy personnel to make what he knew to be improper payments. These payments violated FirstEnergy's policy prohibiting unethical payments. The utility had a related policy that required its legal department to preapprove payments to non-profit organizations. But FirstEnergy and Jones failed to design internal accounting controls to ensure that executives disclosed the purpose of any such payments to its accounting and legal units, as well as any other material information.

### Jones's Share-Based Compensation

65.     Around the time that Jones engaged in the misconduct described above, FirstEnergy awarded him cash and share-based compensation based on a performance-related incentive compensation program, including a cash bonus of about $1.6 million, which FirstEnergy paid him in 2019 for achieving certain

near-term objectives. FirstEnergy also gave Jones performance-adjusted restricted stock units, valued at approximately $18.1 million, for a three-year period ending in 2019.

## COUNT I

### Violations of Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5

66.     Paragraphs 1 through 65 are realleged and incorporated by reference.

67.     Jones, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

68.     Jones knew, or was reckless in not knowing, of the facts and circumstances described above.

69.     By reason of the foregoing, Jones violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II

### Violations of Section 17(a) of the Securities Act

70.     Paragraphs 1 through 65 are realleged and incorporated by reference as though fully set forth here.

71.     By engaging in the conduct described above, Jones, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, has (a) employed devices, schemes and artifices to defraud; (b) obtained money and property by means of untrue statements of material fact and by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

72.     Jones acted knowingly, or with extreme recklessness, in engaging in the fraudulent conduct described above.

73.     Jones also acted negligently in engaging in the conduct described above.

74.     By engaging in the conduct described above, Jones violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

## COUNT III

### Violations of Rule 13a-14

75.     Paragraphs 1 through 65 are realleged and incorporated by reference.

76.     Section 13(a) of the Exchange Act, 15 U.S.C. § 78m, requires issuers of registered securities to file with the Commission factually accurate reports, and Rule 13a-14 thereunder requires that each principal executive certify the disclosures in those reports.

77.     Jones reviewed, approved, signed, and certified FirstEnergy's annual report filed for fiscal year 2019. In his certification accompanying that filing, which Jones provided pursuant to 15 U.S.C. § 7241, he certified that he had "disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):… any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." That was false. Jones was aware of his fraudulent statements and his role in FirstEnergy's internal control over financial reporting.

78.     By engaging in such conduct, Jones violated Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

## COUNT IV

### Violations of Exchange Act Rule 13b2-2

79.     Paragraphs 1 through 65 are realleged and incorporated by reference.

80.     Rule 13b2-2(a) promulgated under the Exchange Act, 17 CFR § 240.13b2-2(a), provides that no director or officer of an issuer shall, among other things, make material misrepresentations to an accountant in connection with an audit, review or examination.

81.     In a management representation letter sent to FirstEnergy's auditor in connection with the firm's audit of FirstEnergy's 2019 financial statements, while participating in the scheme to secretly funnel money to Householder, Jones falsely represented that "[t]here have been no material violations or possible violations whose effects should be considered for disclosure in the financial statements or as a basis for recording a loss contingency, that have not been disclosed in the financial statements."

82.     As explained above, Jones was aware of, and participated in, the scheme involving FirstEnergy's payments to Partners for Progress, which were improperly recorded in the 2019 financial statements that were being audited.

83.     By engaging in the conduct described above, Jones, directly or indirectly made or caused to be made a materially false statement—or omitted to state, or caused another person to omit to state, any material fact necessary to make statements made, in light of the circumstances under which such

statements were made, not misleading—to an accountant in connection with: (a) any audit, review or examination of the financial statements of the issuer required to be made under the federal securities laws; or (b) the preparation or filing of any document or report required to be filed with the SEC.

84.     By engaging in such conduct, Jones violated Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)].

## COUNT V

### Aiding and Abetting FirstEnergy's Violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 Thereunder

85.     Paragraphs 1 through 65 are realleged and incorporated by reference.

86.     FirstEnergy was at all relevant times an issuer that had a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l].

87.     Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1 [17 C.F.R. § 240.13a-1] and 13a-11 [17 C.F.R. § 240.13a-11] thereunder require issuers of registered securities to file with the Commission factually accurate annual reports on Form 10-K and current reports on Form 8-K. An issuer violates these provisions if it files a report that contains materially false or misleading information.

88.     Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] provides that, in addition to the information expressly required to be included in a statement

or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading. Regulation S-X, 17 C.F.R. Part 210, requires that financial statements filed with the Commission pursuant to Section 13(a) of the Exchange Act be prepared in accordance with GAAP or such statements will be presumed to be misleading or inaccurate.

89.     FirstEnergy violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder by filing a Form 8-K on July 23, 2020 that included various false and misleading statements.

90.     Jones knowingly or with extreme recklessness provided substantial assistance to, and thereby aided and abetted, FirstEnergy's violations of Section 13(a) of the Exchange Act, and Rules 12b-20 and 13a-11 thereunder. He participated in the scheme to secretly funneled money using a related entity. He further had actual knowledge that his statements about his and FirstEnergy's role in the scheme were false.

91.     By engaging in such conduct, under Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Jones aided and abetted, and unless enjoined, is reasonably likely to continue to aid and abet, violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-11 [17 C.F.R. §§ 240.12b-20, 240.13a-11] thereunder.

## COUNT VI

### Aiding and Abetting FirstEnergy's Violations of
### Section 13(b)(2)(B) of the Exchange Act

92.     Paragraphs 1 through 65 are realleged and incorporated by reference.

93.     Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things, (i) transactions are executed in accordance with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP and to maintain accountability of assets.

94.     FirstEnergy violated Section 13(b)(2)(B) of the Exchange Act by failing to devise and maintain a system of internal accounting controls that was sufficient to provide reasonable assurances that transactions are executed only in accordance with management's general or specific authorization, including in a manner consistent with FirstEnergy's policies. In particular, FirstEnergy had insufficient internal accounting controls in place to prevent it from making corrupt monetary payments to Householder in exchange for assistance with legislation impacting FirstEnergy's business.

95.     FirstEnergy also failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in

accordance with GAAP, and specifically, that material related party transactions were identified and appropriately disclosed.

96.     Jones provided substantial assistance to FirstEnergy by failing to devise and maintain sufficient internal accounting controls. As CEO, Jones had responsibility for establishing and maintaining FirstEnergy's system of internal accounting controls. He participated in the scheme to make secret payments to Householder through a related entity, in violation of FirstEnergy policies and procedures, and failed to devise and maintain controls that would have prevented such payments. He was directly involved in payments made to a 501(c)(4) organization for Householder's benefit, which FirstEnergy made in exchange for official action. Jones directed and approved payments to be made to Partners for Progress that he knew would be paid to Generation Now, which in turn would benefit Householder. Thus, Jones is liable for aiding and abetting the Section 13(b)(2)(B) violations committed by FirstEnergy.

97.     By engaging in such conduct, under Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Jones aided and abetted, and unless enjoined, is reasonably likely to continue to aid and abet, violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## RELIEF REQUESTED

**WHEREFORE,** the Commission requests that this Court:

## I.  PERMANENT INJUNCTIONS

Pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and (d)(5)], permanently enjoin Jones, his officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendant who receive actual notice of the order of this Court, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder; Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R. § 240.12b-20], 13a-11 [17 C.F.R. § 240.13a-11], 13a-14 [17 C.F.R. § 240.13a-11], and 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)] thereunder; and Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)] of the Exchange Act.

## II. DISGORGEMENT

Order Jones to disgorge the ill-gotten gains he received because of the violations here, including prejudgment interest, pursuant to Section 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)].

## III. CIVIL PENALTIES

Order Jones to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IV. OFFICER AND DIRECTOR BAR

Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], issue an order prohibiting Jones from acting as an officer or director of any issuer that either has a class of securities registered under the Exchange Act, or that is required to file reports pursuant to the Exchange Act.

## V. OTHER RELIEF

Grant such other relief as this Court considers appropriate.

## JURY DEMAND

The Commission requests a trial by jury.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

By: Jonathan S. Polish
Jonathan S. Polish
Brian D. Fagel
Natalie G. Garner
Kristal Olson
Attorneys for Plaintiff
U.S. SECURITIES AND
EXCHANGE COMMISSION
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390
Fax: (312) 353-3381

Email: PolishJ@SEC.gov

REBECCA C. LUTZKO
United States Attorney
Patricia Fitzgerald
Assistant U.S. Attorney
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Telephone: (216) 622-3779
Fax: (216) 522-2404
Email: Patricia.Fitzgerald2@usdoj.gov

Dated: September 12, 2024