# Exhibit 2



Portfolio Media. Inc. | 230 Park Avenue, 7th Floor | New York, NY 10169 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

## How Ohio Case May Alter Corruption Law Landscape

By **Peter Koski and Randall Friedland** (September 8, 2020, 5:27 PM EDT)

When federal agents arrested former Ohio House Speaker Larry Householder on corruption charges, the headlines were jaw-dropping: $60 million in bribes in exchange for a controversial $1.3 billion legislative bailout for two aging nuclear power plants. The fallout was predictable and swift.

Householder was unanimously voted out as speaker, there are calls for his resignation and there are demands to repeal the legislation.

But despite the sensational headlines, the 82-page criminal complaint[1] contains none of the salacious details commonly associated with such bribery schemes. There are no allegations of cash-filled suitcases, private jets or exotic vacations.[2]



Peter Koski

Instead, the complaint alleges that the company that wanted the legislative bailout spent $60 million on far more prosaic fare: media ads, lobbying activity and campaign literature, including $3.5 million for postage.[3]

The complaint alleges that FirstEnergy Corp., identified in the complaint as "Company A," contributed $60 million to Generation Now Inc., an Internal Revenue Code Section 501(c)(4) entity, created to fund a lobbying campaign to enact the legislative bailout and defeat Ballot Campaign, a referendum seeking its repeal.

The complaint alleges that Generation Now spent the money on polls, media buys, and mailers;[4] two media services firms;[5] a political strategy group;



Randall Friedland

[6] Ballot Campaign Organizers to collect the signatures of registered voters;[7] and "a media blitz — television ads, radio ads, mailers, and digital media,"[8] among other First Amendment protected activity.

For example, the complaint says that of the $60 million, Generation Now spent $15 million to finance a last-minute media blitz to secure the bill's passage in the House,[9] and another $38 million "to fund its efforts to defeat the Ballot Campaign"[10] — the referendum to repeal the bailout after it became law.

The complaint alleges that Householder secretly controlled Generation Now,[11] and that the organization spent millions of dollars on campaign contributions to fund Householder's election campaign and his bid to become speaker of Ohio's House of Representatives.

These expenditures included campaign contributions to candidates whom Householder "believed would vote for [him] as Speaker and, ultimately, would follow his lead as Speaker and vote for bailout legislation for Company A."[12]

This case raises several consequential issues at the core of the federal corruption statutes, and it creates significant legal risks for companies engaging in political speech.

It will also be a major test for the U.S. Department of Justice following the U.S. Supreme Court's unanimous decision in Kelly v. U.S., which reversed the infamous "Bridgegate" convictions, and rejected a broad application of the federal fraud and corruption statutes, warning that "not every corrupt act by state or local officials is a federal crime."[13]

**Legal Issues**

The charging theory in this case raises several novel legal issues. The resolution of these issues may alter the landscape of corruption law for years to come.

*Chilling Political Speech*

The complaint alleges some unsavory conduct, and the public reaction to the charges reflects that many are understandably shocked by this live-action version of how a bill becomes a law. But the defense will likely argue that the charges risk chilling political speech and lawful efforts to influence the government. Because most of the money charged as the predicate of the bribe was used to rally support for controversial legislation, the defense will argue that the charging theory criminalizes the political process.

Expect the defense to rely heavily on Kelly, and the Supreme Court's admonition that an expansive application of the federal criminal code to state capitals means that "the [f]ederal [g]overnment could use the criminal law to enforce (its view of) integrity in broad swaths of state and local policymaking."[14]

Lobbying activities implicate First Amendment speech and petition rights, and activities that the complaint alleges — television and radio ads, mailers, digital media, campaign contributions, etc. — are classic forms of political speech.

This case should make companies and organizations think carefully about their lobbying and government relations activities, and it could ultimately deter some entities from executing aggressive lobbying strategies for fear that they could be swept up in a criminal indictment, face an expensive investigation or suffer severe reputational damage.

*Extending McCormick*

Relatedly, the Householder prosecution could result in the expansion of the McCormick v U.S. explicit quid pro quo requirement beyond campaign contributions to other forms of political speech.[15]

In McCormick, the Supreme Court in 1991 held that a campaign contribution can be used as the predicate for a bribe only when there is an explicit quid pro quo agreement.[16]

Courts of appeal have struggled with the meaning of an "explicit" quid pro quo, but all courts agree that, following McCormick, the government must prove a tighter nexus between the campaign contribution and the agreed-upon official action.

The McCormick court reasoned that campaign contributions are an indispensable form of political speech protected by the First Amendment, and without a heightened intent requirement, innocent campaign donors risk getting ensnared in corruption investigations.

That same reasoning could easily extend to other forms of protected political speech, such as television ads supporting legislation.

Extending McCormick may be particularly tempting here, where the political speech does not always benefit the charged public official — as campaign contributions do — but instead benefits the company that financed the political speech.

For this reason, the Householder prosecution may be an enticing invitation to apply a heightened nexus standard to all forms of political speech, for fear of criminalizing politically necessary activity or chilling constitutionally protected conduct.

*The Use of 501(c)(4)s*

This case also has the potential to shape the boundaries and frame the debate about permissible uses of 501(c)(4)s, or what the Internal Revenue Service deems to be tax-exempt, social welfare organizations.

Under federal law, the identities of individuals and corporations who give money to 501(c)(4)s are not made publicly available. As a result, 501(c)(4)s have become a controversial tool in campaign finance and electoral politics.

The complaint makes much of the fact that FirstEnergy contributed to a 501(c)(4) to fund its campaign. It alleges, for example, that the defendants "concealed [secret] payments by using a 501(c)(4) to receive the bribe money, and then transferr[ed] the payments internally to a web of related entities and accounts."[17]

The complaint also alleges that money in the 501(c)(4) was unlimited, and that payments into the entity were "akin to bags of cash."[18]

In contrast, the defense will likely argue that Generation Now was a lawful IRS-sanctioned vehicle to fund FirstEnergy's efforts to promote legislation. The IRS has provided guidance that:

> [s]eeking legislation germane to the organization's programs is a permissible means of attaining social welfare purposes. Thus, a section 501(c)(4) social welfare organization may further its exempt purposes through lobbying as its primary activity without jeopardizing its exempt status.[19]

And although Generation Now made campaign contributions, under IRS regulations, 501(c)(4)s may "engage in political campaign activities if those activities are not the organization's primary activity."[20]

In many cases, the line between engaging in political campaign activities and seeking legislation is arguably nonexistent. As a result, the Householder prosecution may provide an opportunity to better define the permissible uses of 501(c)(4) companies.

Generation Now did not go about its lobbying blitz in a transparent manner, but the opaqueness of the campaign may be an indictment of 501(c)(4)s generally rather than the use of a 501(c)(4) company in this particular case. Indeed, this case has already generated renewed calls for campaign finance reform and the elimination of 501(c)(4)s.

### The DOJ's Use of Anti-Racketeering Law

The charges here are another example of a recent trend by federal prosecutors to expand the use of the Racketeer Influenced and Corrupt Organizations, or RICO, Act — a law originally enacted to deal with organized crime — to target political bribery and corruption.

The complaint and indictment — both charging RICO — coincide with the July 30 indictment of Los Angeles City Councilman Jose Huizar on RICO charges related to allegations of bribery, and the 2016 conviction of former Congressman Chaka Fattah, D.-Pa., on RICO charges related to a corruption scheme.

The Householder indictment and complaint both charge a one-count RICO conspiracy, alleging predicate acts of honest-services fraud, state bribery, extortion and money laundering.

To be sure, the complaint alleges that over $100,000 of Generation Now's money was used to pay for improvements to Householder's Florida residence, and that $300,000 "passed through and funded accounts controlled by [a co-defendant], which the Enterprise used to pay legal fees and settle a lawsuit against Householder."[21]

The indictment also alleges that $20,000 was used "to pay credit card debt held by Householder."[22]

But there is no allegation that FirstEnergy intended, or was even aware, that any of its Generation Now funding would be used to personally benefit Householder. Notably, neither FirstEnergy nor any of its employees were charged in this case, a decision that may reflect the absence of any evidence that the company engaged in a corrupt bargain.

Of course, this analysis is limited to a review of the charging instruments, and obviously does not have visibility into the quantum or quality of the government's evidence. But based on that review,

the defense may argue that, at worst, the complaint alleges wire fraud by illicitly converting some of the 501(c)(4)'s funds for personal use. But that is not a charge in this case.

Alternatively, the complaint's emphasis on the concealment of Householder's involvement in Generation Now reads like a pre-Skilling v. U.S. version of honest services fraud.[23]

Advocating for legislation while surreptitiously directing a 501(c)(4) created to support that legislation suggests a concealed conflict of interest, but the Supreme Court invalidated the notion that such conflicts give rise to criminal liability a decade ago in Skilling.[24]

If RICO emerges as the DOJ's catchall statute for prosecuting corruption, it will represent a major shift in how the department combats such activity. But the change will still require the department to grapple with the legal complexities of the predicate acts, discussed above.

**A Cautionary Tale**

The Householder charges should remind companies to carefully consider the risks and potential consequences of engaging in seemingly innocuous political acts, such as making campaign contributions, contributing to a 501(c)(4) company or other nonprofit organization, spending money to lobby government officials, or financing a campaign to support or oppose legislation.

The Householder complaint notes that over 30 companies contributed to Generation Now,[25] all of which now find themselves in the government's sights. Ironically, these companies are likely spending more money to respond to grand jury subpoenas and conduct internal investigations than they contributed to Generation Now.

The Householder case should caution companies to be thoughtful about their government engagement, and charitable and political giving strategies. To this end, companies should critically assess and develop measures to monitor their spending in domestic politics by implementing a robust compliance program.

---

*Peter Koski is of counsel at Covington & Burling LLP. He previously served as deputy chief of the DOJ's Public Integrity Section.*

*Randall Friedland is an associate at Covington.*

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of the firm, its clients, or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice*

[1] The defendants were indicted shortly after their arrests, but this article still refers to the complaint because it offers a more detailed narrative of the allegations.

[2] Criminal Compl., United States v. Borges, 1-20-MJ-00526 (S.D. Ohio July 17, 2020) ("Compl.").

[3] Id. ¶ 203.

[4] Id. ¶ 151.

[5] Id. ¶ 35(d).

[6] Id. ¶ 35(e).

[7] Id. ¶ 16.

[8] Id. ¶¶ 15 and 89.

[9] Id. ¶¶ 123-24.

[10] Id. ¶ 108.

[11] Id. ¶ 13.

[12] Id.

[13] Kelly v. U.S. , 140 S. Ct. 1565, 1574 (2020).

[14] Id.; see also id. at 1571 ("The upshot is that federal fraud law leaves much public corruption to the States (or their electorates) to rectify.").

[15] McCormick v U.S. , 500 U.S. 257 (1991).

[16] Id. at 271-74.

[17] Compl. ¶ 18.

[18] Id.

[19] Social Welfare Organizations, Internal Revenue Serv., (last updated Apr. 20, 2020), https://www.irs.gov/charities-non-profits/other-non-profits/social-welfare-organizations.

[20] Raymond Chick and Amy Henchey, M. Political Organizations and IRC § 510(c)(4) at 6, available at https://www.irs.gov/pub/irs-tege/eotopicm95.pdf.

[21] Compl. ¶ 23.

[22] Indict., United States v. Householder, 1-20-cr-077 (S.D. Ohio July 30, 2020), ¶ 82(c).

[23] Skilling v. U.S., 561 U.S. 358 (2010).

[24] Id.

[25] Compl. ¶ 81.

All Content © 2003-2024, Portfolio Media, Inc.