# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | Case No. 5:24-cv-1560 |
| | ) | Judge J. Philip Calabrese |
| Plaintiff, | ) ) | |
| | ) | Magistrate Judge |
| v. | ) | Jennifer Dowdell Armstrong |
| | ) | |
| CHARLES E. JONES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

The economic, political, and legal fallout from the House Bill 6 scandal continues to roil Ohio. This case presents one small piece of those ongoing consequences. In this civil enforcement action, the U.S. Securities and Exchange Commission alleges that FirstEnergy's former chief executive officer engaged in securities fraud in connection with that scandal. Defendant moves to dismiss the complaint. Although that motion raises a number of issues, this case touches only on narrow, discrete, and technical aspects of federal securities law. In that respect, this ruling is limited to the specific allegations of securities fraud made here and does *not* involve any other judgment on the scandal or its continuing consequences. Nor does it provide an opportunity or vehicle for litigating any other part of it.

## STATEMENT OF FACTS

Generally, the facts surrounding the return of Larry Householder to being Speaker of the Ohio House of Representatives in 2019 and enactment of House Bill 6

later that year are now reasonably well known.  In short, FirstEnergy Corp. had financial difficulties, in no small part because one of its subsidiaries, FirstEnergy Solutions, operated two aging nuclear power plants.  In 2017, FirstEnergy began courting Householder, who returned to the Ohio House in 2016, and working with him on a plan for him to regain the Speaker's chair.  FirstEnergy hoped that, as Speaker, Householder could pass legislation bailing out its legacy nuclear plants.  Among other things, that plan involved considerable political contributions to enable Householder to back candidates who supported him for Speaker.  All told, FirstEnergy contributed approximately $60 million to support Householder's return to the Speakership and enact the legislation.

As Speaker, Householder introduced House Bill 6, which bailed out or subsidized various of FirstEnergy's operations.  In July 2019, the legislation was enacted and survived a referendum effort to repeal it.  On July 21, 2020, Householder, his political strategist, lobbyists, and others were arrested on federal charges in connection with House Bill 6, ultimately resulting in the conviction of Householder and others.  *See generally Owens v. FirstEnergy Corp. (In re FirstEnergy Corp. Sec. Litig.)*, 149 F.4th 587 (6th Cir. 2025); *United States v. Householder*, 137 F.4th 454 (6th Cir. 2025).

None of that really matters here.  What matters in analyzing Defendant's motion to dismiss are the allegations in the complaint.  Taking the facts alleged in the complaint as true and construing them in Plaintiff's favor, as the Court must on

2

the motion before it, the Securities and Exchange Commission bases its claims in this civil enforcement action on the following facts.

### A.    Key Players

From 2015 to 2020, Defendant Charles E. Jones served as the chief executive officer and president of FirstEnergy Corp. and FirstEnergy Service Company.  (ECF No. 1, ¶¶ 11 & 14, PageID #4.)  During the relevant times, Mr. Jones received a salary and share-based compensation in a performance-related incentive compensation program.  (*Id.*, ¶ 65, PageID #19.)  In 2019, Mr. Jones received a cash bonus of approximately $1.6 million.  (*Id.*, PageID #20.)  Also, he received restricted stock valued at approximately $18.1 million, for the three-year period ending in 2019.  (*Id.*)

FirstEnergy Corp. is a public utility holding company whose stock trades on the New York Stock Exchange.  (ECF No. 1, ¶ 12, PageID #4.)  FirstEnergy and its subsidiaries generate and transmit electricity to millions of customers in Ohio, Pennsylvania, West Virginia, Maryland, New Jersey, and New York, making it one of the largest investor-owned electric systems in the nation.  (*Id.*, ¶ 18, PageID #6.)  Formerly, FirstEnergy was the parent company of an entity called FirstEnergy Solutions (also known as "FES").  (*Id.*, ¶ 13, PageID #4.)  By the end of 2016, FES separated from FirstEnergy and had an independent board of directors. (*Id.*)  In 2018, FES filed for bankruptcy under Chapter 11.  (*Id.*)  Now, this company is known as Energy Harbor Holdings LLC.  (*Id.*)

FirstEnergy Service Company was a wholly owned subsidiary of FirstEnergy during the relevant times.  (*Id.*, ¶ 14.)  FirstEnergy Service provided financial and other support services to FirstEnergy.  (*Id.*)  Between 2017 and March 2020,

FirstEnergy Service paid approximately $60 million, directly or indirectly, to Generation Now, Inc. (*id.*), a corporation organized under Delaware law that enjoys tax-exempt status under Section 501(c)(4) of the Internal Revenue Code (*id.*, ¶ 16, PageID #5). During the relevant times, Householder controlled Generation Now. (*Id.*)

Partners for Progress, Inc. is also a Delaware corporation and a 501(c)(4) organization. (*Id.*, ¶ 17.) According to the complaint, Mr. Jones and other FirstEnergy executives and lobbyists controlled Partners for Progress during the relevant times. (*Id.*; *see also id.*, ¶ 23, PageID #7.) Allegedly, Mr. Jones and another FirstEnergy executive picked the members of the board of Partners for Progress. (*Id.*, ¶ 23, PageID #7.) In doing so, they selected board members not easily identified with FirstEnergy. (*Id.*, ¶ 46, PageID #14.) FirstEnergy provided all funding for Partners for Progress and directed the organization's donations. (*Id.*, ¶ 23, PageID #7; *see also id.*, ¶ 17, PageID #5.)

Larry Householder served in the Ohio House of Representatives from 1997 to 2004, including as Speaker beginning in 2001. (*Id.*, ¶ 15.) In 2016, Householder won election to the chamber again and served until 2020. (*Id.*) He served as Speaker for a second time, from 2019 to 2020. (*Id.*)

### B. Mr. Jones, House Bill 6, and Larry Householder

On its Form 10-K filed in February 2017, FirstEnergy reported over $6 billion in losses, particularly from its nuclear energy affiliate. (*Id.*, ¶ 19, PageID #6.) That affiliate had poor prospects and "substantial uncertainty" about its "ability to continue as a going concern." (*Id.*) After its legislative efforts at the State and federal

4

levels to save its nuclear facilities failed, FirstEnergy schemed with Householder to support his return to the Speakership of the Ohio House.  (*Id.*, ¶ 20.)

A few weeks after Mr. Jones and Householder traveled together on FirstEnergy's private jet in January 2017, executives at the company formed Partners for Progress.  (*Id.*, ¶ 22, PageID #7.)  Mr. Jones approved FirstEnergy's creation of the organization.  (*Id.*, ¶ 4, PageID #2.)  Through Partners for Progress, FirstEnergy secretly funneled nearly $3 million to Householder in connection with his race for Speaker.  (*Id.*, ¶ 24, PageID #7; *see also id.*, ¶¶ 25–28, PageID #8–9.)  These funds originated with FirstEnergy Service, passed through Partners for Progress, then ended up with Generation Now.  (*Id.*, ¶ 24, PageID #7–8.)  A FirstEnergy employee acknowledged that it made these payments through Partners for Progress to avoid public disclosure.  (*Id.*, ¶ 46, PageID #14.)

On January 7, 2019, Householder was elected Speaker of the Ohio House.  (*Id.*, ¶ 30, PageID #9.)  As soon as he became Speaker, Householder worked with Mr. Jones and others at FirstEnergy on legislation the company desired.  (*Id.*, ¶ 31.)  In April 2019, Householder introduced the legislation, which became House Bill 6.  (*Id.*, ¶ 32.)  Among other things, the bill subsidized FirstEnergy's Ohio electric distribution subsidiaries and authorized FirstEnergy to impose a surcharge on its customers if its annual revenues fell below a certain baseline.  (*Id.*, ¶ 32.)

On July 23, 2019, the Governor signed House Bill 6 into law.  (*Id.*, ¶ 33, PageID #10.)  Soon, opponents of the legislation mounted a campaign to repeal it through a ballot referendum.  (*Id.*, ¶ 34.)  In response, Mr. Jones and FirstEnergy

5

directed additional funds to Householder to defeat the effort.  (*Id.*)  Ultimately, FirstEnergy sent $13 million through Partners for Progress to Generation Now.  (*Id.*, ¶ 35.)  Generation Now launched a media strategy and sent mailers attacking the initiative.  (*Id.*)  Also, it "bribe[d] a manager of the signature-collection effort for inside information and hire[d] private investigators to track signature collectors to harass and intimidate them."  (*Id.*)  In the end, efforts to repeal House Bill 6 failed. (*Id.*, ¶ 36, PageID #11.)

In February 2020, Householder asked Mr. Jones to support a ballot initiative, which would allow him to extend his service as Speaker through 2037.  (*Id.*, ¶ 37.) Shortly after that, Partners for Progress sent another $2 million to Householder through other 501(c)(4) organizations.  (*Id.*)

In total, between March 2017 and March 2020, FirstEnergy directly and indirectly sent Householder close to $60 million.  (*Id.*, ¶ 39, PageID #12.)  During this time, Householder and his political allies referred to FirstEnergy as "the bank."  (*Id.*)

### C. Mr. Jones's Allegedly False Statements

In July 2020, federal authorities arrested Householder and charged him with leading a racketeering conspiracy to receive $60 million in bribes in connection with House Bill 6.  (*Id.*, ¶ 40.)  After Householder's indictment, FirstEnergy's payments through Partners for Progress were publicly disclosed for the first time.  (*Id.*, ¶ 46, PageID #14.)  According to the complaint, Mr. "Jones and FirstEnergy made multiple false statements to hide their involvement in the alleged conspiracy."  (*Id.*, ¶ 41.)

6

### C.1. FirstEnergy's "Ethical," "Proper," and "Transparent" Actions

Following the arrest of Householder on July 21, 2020, Mr. Jones told the public that "FirstEnergy acted ethically in this matter" and "transparently." (*Id.*, ¶ 2, PageID #2.) The SEC alleges that these statements were false and misleading within the meaning of the securities laws because FirstEnergy's payments to Householder "were unethical." (*Id.*, ¶ 3 (emphasis removed).) Additionally, the SEC alleges that these statements were "not transparent" because the money was funneled through organizations set up under Section 501(c)(4) of the Internal Revenue Code. (*Id.*, ¶ 4 (emphasis removed).) In political parlance, the SEC points out, such movement of funds is known as "dark money" and does not require the disclosure of donors. (*Id.*) According to the SEC, the point of such organizations is to operate secretly, without disclosing payments to the public. (*Id.*, ¶ 45, PageID #13.) Therefore, the SEC alleges that Mr. Jones knew that his statements about FirstEnergy acting transparently were not accurate. (*See id.*)

On July 23, 2020, FirstEnergy filed a Form 8-K with the SEC that included a press release in which Mr. Jones stated: "I believe that FirstEnergy acted ethically in this matter. At no time did our support for Ohio's nuclear plants interfere with or supersede our ethical obligations to conduct our business properly." (*Id.*, ¶ 42, PageID #12.)

In an earnings call on July 24, 2020, Mr. Jones addressed the scandal and said that "FirstEnergy acted properly" and conducted "business transparently, ethically, [and] professionally":

7

> I believe that FirstEnergy acted properly in this matter and we intend to cooperate fully with the investigation . . . .
>
> [L]et me be clear[,] at no time[,] does our support for nuclear plants in Ohio interfere or supersede our ethical obligations to conduct our business properly.
>
> I can tell you this, in every meeting, every phone call, every text message that I participate in, I've talked about our obligations to conduct our business transparently, ethically, professionally.  I have no worries that I did anything that wasn't that way.  And we let the merits of our arguments carry the day when we are operating in the political environment.

(*Id.*, ¶ 43, PageID #13.)  In making these statements, the SEC alleges that Mr. Jones knew that he and FirstEnergy acted unethically and not transparently.  (*Id.*, ¶ 44.)

Additionally, the SEC alleges that Mr. Jones knew that FirstEnergy had improper and unethical goals.  (*Id.*, ¶ 47, PageID #14.)  According to the complaint, he knew that FirstEnergy made tens of millions of dollars in direct and indirect payments to Householder to influence the Speaker to ensure passage of House Bill 6 and to defeat its repeal by referendum.  (*Id.*)

### C.2.   Relationship with FirstEnergy Solutions

During the earnings call on July 24, 2020, Mr. Jones spoke to the relationship between FirstEnergy and FirstEnergy Solutions.  He characterized FES as separate and independent and stated that First Energy had no involvement in the decisions FES made:

> FES separated fiduciarily, financially and operationally from being a part of FirstEnergy.  They put in place an independent board and from November [20]16, I've had no input into any of the decisions they've made.
>
> We were not involved in any way in the decisions made by FES.

8

(*Id.*, ¶ 49, PageID #14–15.)  According to the SEC, these statements were not true. (*Id.*, ¶ 50, PageID #15.)  To the contrary, "FirstEnergy and [Mr.] Jones exerted significant influence over FES and its officers."  (*Id.*, ¶ 13, PageID #4.)

Mr. Jones allegedly coordinated with FES executives, "including by direct[ing] FES payments to Generation Now."  (*Id.*, ¶ 50, PageID #15.)  According to the complaint, Mr. Jones pressured FES to finance Generation Now's ad campaign supporting House Bill 6.  (*Id.*, ¶ 51.)  At various points in the process leading to enactment of House Bill 6, Mr. Jones texted Householder that he was "pushing FES to engage."  (*Id.*)  On another occasion, Mr. Jones spoke to FES's creditor representative, who agreed to help.  (*Id.*)  In October 2019, Mr. Jones struck a deal with FES:  FirstEnergy would provide $10 million to support Householder's effort to enact House Bill 6; in exchange, FES would provide certain benefits to FirstEnergy in connection with a real estate transfer.  (*Id.*, ¶ 52.)  At one point that month, Householder needed $3 million immediately.  (*Id.*)  Mr. Jones wanted FES to make that payment; however, because FES had not yet emerged from bankruptcy, it could not do so.  (*Id.*, Page ID #15–16.)  FirstEnergy made the payment instead, and Mr. Jones said he "want[ed] an IOU" from FES.  (*Id.*, PageID #16.)

According to the complaint, these facts show that Mr. "Jones lied when he assured the public" that FirstEnergy was "not involved in any way" in FES's decisions.  (*Id.*, ¶ 53.)  To the contrary, Mr. "Jones and his FES counterpart closely coordinated FirstEnergy's and FES's payments to maximize the effect of such giving." (*Id.*)

9

### C.3. False Certifications for SEC Filings

As the company's chief executive officer, Mr. Jones "reviewed, approved, signed, and certified FirstEnergy's annual report filed for fiscal year 2019." (*Id.*, ¶ 55.) By doing so, the SEC alleges that Mr. Jones "aided and abetted the misrepresentations and omissions made by FirstEnergy in an SEC filing." (*Id.*, ¶ 5, PageID #2–3.) As part of his certification, the SEC alleges that Mr. Jones made false statements falling under two broad headings.

### C.3.a. Internal Controls

Mr. Jones was responsible for devising and maintaining FirstEnergy's internal controls over financial reporting. (*Id.*, ¶ 55, PageID #16.) On February 20, 2020, FirstEnergy filed its 2019 annual report, which Mr. Jones signed, confirming that management fulfilled its responsibility of devising and maintaining internal control over financial reporting. (*Id.*, ¶ 56, PageID #17.) When Mr. Jones certified FirstEnergy's Form 10-K for 2019, he represented that he disclosed to the company's auditors and the audit committee of the board of directors "any fraud, whether or not material, that involves management or other employees" who have a significant role in internal control over financial reporting. (*Id.*, ¶ 57.) When Mr. Jones made this certification, the SEC alleges that it was knowingly false because he knew about the company's payments through Partners for Progress, which were not disclosed in FirstEnergy's SEC filings. (*Id.*, ¶ 58.)

Additionally, the complaint alleges that Mr. Jones "substantially assisted FirstEnergy's failure to devise and maintain sufficient internal accounting controls." (*Id.*, ¶ 63, PageID #19.) Mr. "Jones was charged with ensuring that FirstEnergy

10

devised and maintained a system of internal accounting controls that provided reasonable assurances that company funds were being used for purposes in accordance with management's authorization." (*Id.*) Notwithstanding this responsibility, Mr. Jones directed personnel at FirstEnergy to make allegedly improper payments, in violation of company policy. (*Id.*, ¶ 64.) Specifically, FirstEnergy's code of conduct provided that "Company assets and funds may be used only for legitimate business purposes and may never be used for illegal purposes" and employees should not "knowingly cause corporate funds to be used for unlawful purposes or for purposes other than those described by the documentation supporting payment." (*Id.*, ¶ 61, PageID #18.)

Moreover, FirstEnergy had a policy that its legal department approve payments to tax-exempt organizations. (*Id.*, ¶ 64, PageID #19.) But Mr. Jones failed to design internal accounting controls to ensure disclosure of the purpose of any such payments. (*Id.*) The SEC alleges that Mr. Jones "aided and abetted FirstEnergy's failure to devise and maintain internal accounting controls" that would have prevented the House Bill 6 scandal. (*Id.*, ¶ 5, PageID #2.)

### C.3.b. Misleading the Company's Auditor

According to the complaint, Mr. Jones hid FirstEnergy's involvement with House Bill 6 from the company's auditor. (*Id.*, ¶ 59; *see also id.*, ¶ 5, PageID #2.) On February 20, 2020, Mr. Jones signed a management representation letter to FirstEnergy's auditor in which he stated: "There have been no violations or possible violations of laws or regulations whose effects should be considered for disclosure in the consolidated financial statements or as a basis for recording a loss contingency."

11

(*Id.*, ¶ 59, PageID #17–18.)  This statement is false, the SEC alleges, because the payments to Partners for Progress, an entity related to FirstEnergy, should have been disclosed pursuant to generally accepted accounting principles under Accounting Standards Codification 850, titled "Related Party Disclosures."  (*Id.*, ¶ 60, PageID #18.)  Further, the complaint alleges that Mr. Jones misled the company's auditor by representing that "he was unaware of FirstEnergy's violations of the law during the relevant period."  (*Id.*)

### C.4.  Materiality

According to the SEC, FirstEnergy's payments in connection with House Bill 6 and Mr. Jones's misrepresentations and omissions were material to the company's investors because they "cast doubt on the integrity and judgment of FirstEnergy's management" and "exposed both the company and Mr. Jones to criminal and civil liability."  (*Id.*, ¶ 54, PageID #16.)  Additionally, the amounts of the payments were material.  (*Id.*)  For example, in the fourth quarter of 2019, FirstEnergy reported $111 million in losses and "facilitated $20 million in secret payments to Partners for Progress, $15 million of which was passed on to Householder."  (*Id.*)

Over two days, July 21 and July 22, 2020, following Householder's arrest and the announcement of federal criminal charges against him and others, FirstEnergy's stock price dropped from $41.26 per share to $27.09.  (ECF No. 16-2, PageID #242.)  In the days that followed, the share price recovered marginally, trending around $29 per share for a time.  (*Id.*)

12

**STATEMENT OF THE CASE**

On March 9, 2023, a federal jury convicted Householder of leading a racketeering conspiracy to accept bribes, including from FirstEnergy. (*Id.*, ¶ 15, PageID #5.) Some eighteen months later, the SEC filed this civil enforcement action against Defendant Charles E. Jones, FirstEnergy's former chief executive officer. (ECF No. 1.) In the complaint, the SEC asserts six causes of action for alleged violations of: (1) Section 10(b) of the Exchange Act and Rule 10b-5; (2) Section 17(a) of the Securities Act; (3) Rule 13a-14 (requiring the certification of factually accurate disclosures filed with the Commission); and (4) Rule 13b2-2 (prohibiting material misrepresentations to an accountant in connection with an audit, review, or examination). Also, Plaintiff alleges that Mr. Jones aided and abetted FirstEnergy's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 (Count 5). Finally, in Count 6, Plaintiff alleges that Mr. Jones aided and abetted FirstEnergy's violations of Section 13(b)(2)(B) of the Exchange Act. Defendant moves to dismiss the complaint. (ECF No. 12.)

**ANALYSIS**

In any civil action, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. American Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). To survive a motion to dismiss, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability." *Twombly*, 550 U.S. at 555, 557 n.5.

When analyzing a complaint under this standard, courts construe factual allegations in the light most favorable to the plaintiff, accepts them as true, and draws all reasonable inferences in the plaintiff's favor. *Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015). But a pleading must offer more than mere "labels and conclusions," because "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Nor is a court required to accept "[c]onclusory allegations or legal conclusions masquerading as factual allegations[.]" *Eidson v. Tennessee Dep't of Child.'s Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

Therefore, the Court must distinguish between "well-pled factual allegations," which must be treated as true, and "naked assertions," which need not be. *See Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (cleaned up); *see also, e.g.*, *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 375 (6th Cir. 2011) (determining that because some of the plaintiff's factual allegations were "not well-pleaded[,]" "their conclusory nature 'disentitles them to the presumption of truth'"). Rule 8, to say nothing of the Private Securities Litigation Reform Act, "does not unlock the doors of

14

discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.

In addition, fraud claims must meet Rule 9(b)'s heightened pleading standard. This Rule requires a plaintiff to "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b).  Generally, Rule 9(b) requires a plaintiff "(1) to specify the allegedly fraudulent statements; (2) to identify the speaker; (3) to plead when and where the statements were made; and (4) to explain what made the statements fraudulent." *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012) (citation omitted).  But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

\* \* \*

On a motion under Rule 12(b)(6), the Court's inquiry is limited to the content of the complaint, although it may also consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to or made part of the complaint. *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001).  In support of his motion to dismiss, Defendant includes certain materials that do not appear in the complaint, directly or by implication.  (ECF No. 11-2.)  Because they go beyond the pleadings, are not integral to the complaint, and are not matters of public record in a legal sense or in any way that matters in this case, the Court disregards them in resolving the motion to dismiss. *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

Likewise, in opposing dismissal, the SEC attaches a deferred prosecution agreement into which FirstEnergy entered.  (ECF No. 16-1.)  Although this document

15

is a matter of public record, the Court declines to consider it for two reasons.  First, this agreement is not part of the complaint and not even referenced in it.  Second, the law disfavors its use here in any event.  *See, e.g.*, *United States v. Sanders*, 95 F.3d 449, 454 (6th Cir. 1996); *In re FirstEnergy Corp. Sec. Litig.*, Nos. 2:20-cv-3785 & 2:20-cv-4287, 2022 WL 681320, at *4 n.11 (S.D. Ohio Mar. 7, 2022); *S.E.C. v. Healthsouth Corp.*, 261 F. Supp. 2d 1298, 1328–29 (N.D. Ala. 2003).

Also, the SEC includes the declaration of an accountant analyzing FirstEnergy's stock price following the indictment of Householder.  (ECF No. 12-2.) Although the complaint does not make allegations about FirstEnergy's stock price following the indictment of Householder, the Court takes judicial notice of the publicly available stock prices as generally relevant to claims of securities fraud. *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322–23 (2007).  In doing so, the Court declines to convert the motion under Rule 12(b)(6) into one for summary judgment.

**I.      Section 10(b), Rule 10b-5, and Section 17(a) (Count 1 and Count 2)**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for anyone to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest for the protection of investors."  15 U.S.C. § 78j(b). To enforce this statute, the SEC promulgated Rule 10b-5, which makes it "unlawful to, among other things, 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the

16

circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). "The scope of Rule 10b-5 is coextensive with the coverage of § 10(b)." *SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002) (citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976)).

Section 17(a) of the Securities Act of 1933 makes it unlawful for any person, directly or indirectly in the offer or sale of any securities "(1) to employ any device, scheme or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statement made, in light of the circumstance under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).

The elements of these anti-fraud provisions are essentially the same. *See Aaron v. SEC*, 446 U.S. 680, 695 (1980); *Ernst & Ernst*, 425 U.S. at 196. The main difference is that Section 10(b) applies to both buyers and sellers while Section 17(a) applies only to sellers. *Aaron*, 446 U.S. at 687. Because the elements overlap, courts often analyze claims under Section 10(b) and Section 17(a) together. *See SEC v. Patel*, No. 07–cv–39–SM, 2008 WL 781914, at *7 (D.N.H. Mar. 24, 2008). Therefore, to establish violations of these anti-fraud provisions, the SEC must show that a defendant (1) made material misrepresentations or omitted material facts to investors; (2) made the misrepresentations or omissions "in connection with the offer,

17

sale or purchase of securities"; and (3) either knew investors were being mislead or acted recklessly in doing so. *SEC v. Zada*, 787 F.3d 375, 382 (6th Cir. 2015) (citing *SEC v. George*, 426 F.3d 786, 792 (6th Cir. 2005)).

"Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) a defendant made a statement or omission that was false or misleading; and (2) this statement or omission concerned a material fact." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014) ("*Omnicare III*"). What is required of a plaintiff changes based on whether they allege an "affirmative misrepresentation, as opposed to omissions" and whether the misrepresentation or omission "contains hard, as opposed to soft, information." *Id.*

The SEC alleges that Mr. Jones made various misrepresentations and omissions to the investing public about FirstEnergy's payments to Larry Householder. The misrepresentations and omissions that the SEC maintains are actionable fall into two general categories: (1) statements about FirstEnergy acting ethically, properly, and transparently; and (2) statements about the relationship between FirstEnergy and FirstEnergy Solutions.

### I.A.  Misrepresentations

"A misrepresentation is an affirmative statement that is misleading or false." *Omnicare III*, 769 F.3d at 470. Misrepresentations may contain either hard or soft information. Hard information usually concerns "historical information or other factual information that is objectively verifiable." *Id.* That type of statement may be actionable where "a plaintiff pleads facts showing that the statement concerned a

material fact and that it was objectively false or misleading."  *Id.*  Misrepresentations containing soft information "add[] a subjective inquiry to an otherwise objective element" and "include predictions and matters of opinion."  *Id.*  Nonetheless, at this first step, a court determines whether statements are in fact actionable misstatements and, if so, whether they were material, nothing more.  *Id.*  Whether the defendants made those statements with knowledge of their falsity is reserved for the scienter analysis.  *Id.* at 471.

"[V]ague, soft, puffing statements or obvious hyperbole" of "corporate optimism[,]" which can be either "forward looking" or generalized to the point they are "not capable of objective verification," cannot form the basis of a claim under Section 10(b).  *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004).

> [F]ederal courts everywhere have demonstrated a willingness to find immaterial as a matter of law certain kinds of rosy affirmation heard from corporate managers and numbingly familiar to the marketplace— loosely optimistic statements that are so vague, [and] so lacking in specificity, . . . that no reasonable investor could find them important to the total mix of information available.

*Id.* at 570–71 (quotations omitted).  In other words, comments that fall within the "realm of corporate puffery . . . do nothing more than vaguely predict positive future results," which means that a reasonable investor would not have relied on such statements.  *Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009).

The alleged misrepresentations that the SEC maintains are actionable concern Mr. Jones's statements about FirstEnergy's involvement in the House Bill 6 scandal following the arrest of Householder.  In a press release about the indictment on July

19

23, 2020, Mr. Jones stated: "I believe that FirstEnergy acted ethically in this matter. At no time did our support for Ohio's nuclear plants interfere with or supersede our ethical obligation to conduct our business properly." (ECF No. 1, ¶ 42, PageID #12.) The next day on an earnings call, Mr. Jones again addressed the scandal, saying, "I believe that FirstEnergy acted properly. . . .  [I]n every meeting, every phone call, every text message that I participate in, I've talked about our obligations to conduct our business transparently, ethically, professionally.  I have no worries that I did anything that wasn't that way." (*Id.*, ¶ 43, PageID #13.)  On that call, Mr. Jones again referenced the company's ethical obligations: "[L]et me be clear[,] at no time[,] does our support for nuclear plants in Ohio interfere or supersede our ethical obligations to conduct our business properly." (*Id.*)  And he concluded by saying, "we let the merits of our arguments carry the day when we are operating in the political environment." (*Id.*)

### I.A.1. "Ethically" and "Properly"

The SEC alleges that Mr. Jones's statements were false or misleading because Mr. Jones knew that he and FirstEnergy made millions of dollars of payments to Householder that were "improper and unethical." (*Id.*, ¶¶ 44–45, 47.)  Specifically, the SEC alleges that, by making these statements and not affirmatively discussing FirstEnergy's involvement in the alleged conspiracy, Mr. Jones "doubled-down on his and FirstEnergy's underlying unethical and secretive misconduct." (*Id.*, ¶¶ 44–48, PageID #13–14.)  The SEC argues that a reasonable investor would have construed these statements as a "denial of the scheme and, by extension, of the allegations set forth in the indictment [of Householder]."  (ECF No. 16, PageID #158–60 (citing

20

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188–89 (2015).)

Defendant maintains that these statements are "classic opinion statements under the securities laws." (ECF No. 12-1, PageID #104–06.)  Specifically, he argues that the SEC has not shown that the "challenged opinions lacked a reasonable basis" and, therefore, are not actionable.  (*Id.*, PageID #104–05.)  And because the information about the scandal was public at the time of the statements, a reasonable investor could not view them as misleading.  (ECF No. 18, PageID #267–70.)

Most statements of opinion are not actionable under securities law.  *Omnicare*, 575 U.S. at 185–87.  To be actionable, opinions must (1) not actually be believed by the speaker or (2) contain an "embedded statement of fact" that is untrue.  *Id.* at 185–86.  Neither circumstance pertains in the alleged misrepresentations at issue. Instead, statements that Mr. Jones believed FirstEnergy acted ethically and properly are more akin to the "rosy affirmation[s] commonly heard from corporate managers" that are "numbingly familiar to the marketplace." *In re Ford Motor Co.*, 381 F.3d at 570.  That is, they are the type of "corporate speak [that] is predictable" because corporate leaders are expected to be optimistic and confident about the businesses they manage.  *Newtyn Partners, LP v. Alliance Data Sys. Corp.*, 166 F.4th 947, 961 (6th Cir. 2026).  Securities law does not demand that Mr. Jones "treat every glass as half empty" or take a "gloomy, fearful, or defeatist view."  *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129–30 (2d Cir. 1994)).  And investors should

expect that a company will take an optimistic view.  *See id.* (explaining investors should expect a company to speak optimistically).

Still, the SEC focuses on the statement that the company "let[s] the merits of our argument carry the day when operating in the political environment."  (ECF No. 1, ¶ 43, PageID #13.)  Specifically, the SEC argues that a reasonable investor would construe this statement as a "wholesale denial of the DOJ's case." (ECF No. 16, PageID #166.)  But this statement amounts to little more than a boilerplate corporate platitude.  Even if taken as a denial of the case against Householder and others, the statement contains no information that is false or misleading in the circumstances in which it was made.  Indeed, FirstEnergy's efforts to secure passage of House Bill 6 depended on political fortunes and might well have met the same fate as its prior efforts at the State and federal levels to secure relief from its legacy nuclear costs. And FirstEnergy, Mr. Jones, or others accused of crimes have no obligation, even under the securities laws, to admit the allegations of criminal charges.  Under the Constitution, it is difficult to see how they could.

Here, the statement expresses an opinion—one of the type the market is accustomed to hearing and one to which it assigns little weight, if any—that FirstEnergy had viable defenses and legal arguments if brought into the case against Householder.  Such honestly held statements of legal compliance cannot form the basis for securities fraud.  *See Omnicare*, 575 U.S. at 184, 186; *see also Oakland Cnty. Emps.' Ret. Sys. v. Sotera Health Co.*, No. 25-3311, 2026 WL 508962, at *6 (6th Cir. Feb. 24, 2026) (holding that a company's statements expressing optimism regarding

ongoing litigation were not actionable).  Accordingly, these statements also fall within the "realm of corporate puffery," which do nothing more than vaguely predict positive future results."  *Indiana State Dist. Council*, 583 F.3d at 944; *see Omnicare*, 575 U.S. at 184, 186.

### I.A.2. "Transparently

Further, the SEC contends that Mr. Jones's statements about FirstEnergy conducting its business "transparently" were false and misleading.  (ECF No. 1, ¶¶ 43–45 & 48, PageID #13–14.)  Specifically, the SEC alleges that "there was nothing 'transparent'" about FirstEnergy's payments to Householder through Partners for Progress, the entity organized under Section 501(c)(4).  (*Id.*, ¶ 45, PageID #13.)  By insisting that FirstEnergy acted transparently, the SEC argues that Mr. Jones's statement was "effectively a denial of the existence of the surreptitious payments to Householder's dark money entities."  (ECF No. 16, PageID #167.)

In response, Defendant argues that the SEC takes the single word "transparently" out of the context in which it was made in the earnings call on July 24, 2020.  (ECF No. 12-1, PageID #105–06; ECF No. 18; PageID #271–72.)  When the entire statement is considered, it is not misleading—Defendant maintains—because making political contributions through a 501(c)(4) and not disclosing them does not make a business's operations non-transparent.  (ECF No. 12-1, PageID #106.)

Mr. Jones's claim that FirstEnergy conducted its business transparently presents another soft, puffing opinion that is not actionable as securities fraud. Putting this statement in context reinforces this conclusion.  *See Newtyn Partners*, 165 F.4th at 962.  On the same call, Mr. Jones told investors that FirstEnergy

23

"intend[s] to cooperate fully with the investigation to, among other things, ensure [the] company and [its] role in supporting House Bill 6 is understood as accurately as possible." (ECF No. 11-1, PageID #61; *see also* ECF No. 1, ¶ 43, PageID #13.)  In conjunction with the claim that FirstEnergy conducts its business transparently, this statement expresses a positive outlook toward the ongoing investigation, which is not actionable.  *See Sotera Health*, 2026 WL 508962, at *6.  And a reasonable investor could not view this information as "significantly changing the general gist of available information" or be misled by this information.  *In re Ford*, 381 F.3d at 570.

Contrary to the SEC's assertion that Mr. Jones acknowledged only the existence of the DOJ's indictment and its contents and not the payments referenced in it (ECF No. 16, PageID #169), Mr. Jones confirmed that FirstEnergy made payments to Householder's 501(c)(4) entities (ECF No. 11-1, PageID #65).  In response to a specific question about payments to "this 501(c)(4)," Mr. Jones disclosed that "FirstEnergy's share of [the funds referenced in the Department of Justice affidavit] is about 25%." (*Id.*)

Beyond that, the SEC bases its position on the absence of disclosure of donations to 501(c)(4) organizations aligned with Householder. (ECF No. 1, ¶ 45, PageID #14.)  In other words, in the SEC's view, FirstEnergy could not be transparent because it did not disclose its dark money payments. (ECF No. 16, PageID #166–69.)  However, this position suffers from two fatal flaws.  First, the law does not require such disclosure.  *See* 26 I.R.C. §§ 6001, 6011 & 6033; 26 C.F.R. §§ 1.6001-1, 1.6033-2 (because donations to a 501(c)(4) entity are not tax deductible, disclosure of donors is

24

not required).  Indeed, since the Supreme Court's decision in *Citizen's United v. Federal Election Commission*, 558 U.S. 310 (2010), there has been an increase in political spending and activity through 501(c)(4) organizations, in part, because there is no requirement for public disclosure of donors.  *See NorCal Tea Party Patriots v. IRS*, No. 1:13-cv-341, 2016 WL 11940103, at *4 (S.D. Ohio Nov. 4, 2016) (explaining the increase in political activity and spending by 501(c)(4) organizations).  Second, even before the indictment of Householder, FirstEnergy's involvement in efforts to enact House Bill 6 and to defeat the referendum to repeal it were widely known and matters of common knowledge throughout Ohio.

For all these reasons, the statement that FirstEnergy conducted its business "transparently" is not actionable under the securities laws either.

### I.B.    Omissions

The SEC alleges that Mr. Jones misrepresented his relationship with FES to investors.  (*See, e.g.*, ECF No. 1, ¶ 50, PageID #15.)  In particular, the complaint avers that Mr. Jones coordinated with executives at FirstEnergy Solutions, directing FES's payments to Generation Now.  (*Id.*)  Because the complaint alleges that FirstEnergy did not disclose the relationship between Mr. Jones and FES, the Court treats the statements as omissions.

### I.B.1. Standard for Actionable Omissions

Omissions may be actionable in two circumstances:  (1) where a company has an affirmative duty to disclose (for example, when an insider trades or a statute requires disclosure); or (2) where a company makes "an inaccurate, incomplete, or misleading prior disclosure" that it must then correct.  *Omnicare III*, 760 F.3d at 471

25

(citing *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005)).  In the latter circumstance, a person has a duty to disclose hard information it may receive "if it renders a prior disclosure objectively inaccurate, incomplete, or misleading." *Id.* (citing *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 576 (6th Cir. 2008)).  Hard information usually concerns "historical information or other factual information that is objectively verifiable." *Id.* at 470.  If "new information is soft, then a person or corporation has a duty to disclose it only if it is virtually as certain as hard facts and contradicts the prior statement." *Id.* (cleaned up).  At bottom, where a person chooses to speak, federal securities laws "require an actor to 'provide complete and non-misleading information with respect to the subjects on which he undertakes to speak.'" *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) (en banc) (quoting *Rubin v. Schottenstein*, 143 F.3d 263, 268 (6th Cir. 1998)).

### I.B.2. Relationship with FirstEnergy Solutions

The SEC alleges that Mr. Jones made material misrepresentations about his relationship with FES on the July 24, 2020 earnings call, during which he represented that he (and FirstEnergy) had no input into the decision of FirstEnergy Solutions:

> FES separated fiduciarily, financially, and operationally from being a part of FirstEnergy.  They put in place an independent board and from November 2016, I've had no input into any decision they've made.
>
> We were not involved in any way in the decisions made by FES.

(ECF No. 1, ¶ 49, PageID #14–15.)  The SEC argues that these statements were not "remotely true" because the "truth was that Mr. Jones repeatedly pressured FES to

26

make 501(c)(4) payments." (ECF No. 16, PageID #164.) Defendant responds that the statements were true because FES "ultimately made its own decisions," and a reasonable investor would not interpret his statements to mean that Mr. Jones "never discussed issues of mutual interest with FES or encouraged FES to make decisions that might benefit FirstEnergy." (ECF No. 12-1, PageID #107.)

Ultimately, the SEC's argument depends on a fact it does not allege—that Mr. Jones or FirstEnergy were involved in (or controlled) FES's decisions regarding House Bill 6. As the complaint details, however, "[a]s of November 16, 2016, FES was governed by an independent board of directors." (*Id.*, ¶ 13, PageID #4.) And FES "separated fiduciarily, financially and operationally from being a part of FirstEnergy." (*Id.*, ¶ 49, PageID #14–15.) These facts confirm that FES and its executives and board of directors independently made decisions for FES, not Mr. Jones.

All the complaint alleges is that Mr. "Jones continued regularly coordinating with FES executives, including by directing FES payments to Generation Now." (ECF No. 1, ¶ 50, PageID #15; *see also id.*, ¶ 53, PageID #16 ("Jones and his FES counterpart closely coordinated FirstEnergy's and FES's payments to maximize the effect of such giving.").) Beyond that, the SEC alleges that:

- Mr. "Jones pressured FES to finance Generation Now's ad campaign" promoting" House Bill 6. (*Id.* ¶ 51, PageID #15.)

- Mr. Jones texted Householder, telling him, "I will be pushing FES to engage" and said he would "talk to FES tomorrow about paying for" ads supporting House Bill 6.  (*Id.*)

- Mr. "Jones and his FES counterpart closely coordinated FirstEnergy's and FES's payments to maximize the effect of such giving."  (*Id.* ¶ 54, PageID #16.)

- Mr. "Jones updated his FES counterpart about his talks with" Householder and knew about FES payments to Householder.  (*Id.*, ¶¶ 29 & 36, PageID #9 & 11.)

- "FirstEnergy and Jones exerted significant influence over FES and its officers."  (*Id.*, ¶ 13, PageID #4.)

- Mr. Jones struck a deal with FES in October 2019 for FirstEnergy to fund Householder's efforts to fight repeal of House Bill 6 in exchange for FES making certain concessions in a real estate transfer.  (*Id.*, ¶ 52, PageID #15.)

None of these allegations, construed in Plaintiff's favor, suggest that the statement that Mr. Jones was "not involved in any way in the decisions made by FES" is false or misleading.  Coordination, even close coordination or pressure of an independent actor—a company with its own board operating, for part of the time, in bankruptcy—does not make Mr. Jones or FirstEnergy involved in that separate entity's internal decision-making.  At least, no reasonable investor could so conclude.  *See, e.g., Helwig*, 251 F.3d at 561 (citation omitted).

Additionally, the broader context surrounding Mr. Jones's statements about FES provide further support for this conclusion.  In response to a question on the July 24, 2020 call whether he had "any control over FES payments as well," Mr. Jones provided the response on which the SEC seizes and confirmed that there were "a lot of discussions between the 2 companies as it relates to transition and shared services and so forth."  (ECF No. 11-1, PageID #65.)  But he made clear that he had no decision-making authority.  (*Id.*)  These statements were sufficiently complete; meaning that they are not false or misleading as a matter of law.

**I.C.  Scheme Liability**

In addition to its Rule 10b-5(b) claim, the SEC alleges scheme liability under Rule 10b-5(a) and (c).  Under this provision, it is unlawful to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as fraud or deceit upon any person."  17 C.F.R. § 240.10b-5(a) & (c).  "While that language contemplates liability for more than just false statements, there is 'considerable overlap' between a typical Rule10b-5(b) claim and scheme liability."  *Newtyn*, 165 F.4th at 971 (cleaned up).  To state a claim for scheme liability, a plaintiff must show "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2025) (quoting *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021)).

For scheme liability under Rule 10b-5(a) and (c), the SEC relies on the same allegations that support its claims based on misrepresentations and omissions under

29

Rule10b-5(b). Therefore, the same analysis applies to the scheme liability as the misrepresentations and omissions. *See ServiceMaster*, 83 F.4th at 533 ("Although scheme-liability claims under Rule 10b-5(a) and (c) are separate from misrepresentation-and-omission claims under Rule 10b-5(b), [plaintiff] relies on the same factual circumstances to make out both claims in this case."). Indeed, the SEC does not subdivide its scheme-liability claims. Instead, it incorporates all of Mr. Jones's conduct, statements, and omissions as the basis for all claims under Section 10(b), Rule 10b-5, and Section 17(a). Because the Court determined that none of the alleged misrepresentations or omissions is actionable, the scheme-liability claims fail for the same reasons.

### I.D.    Purchase or Sale of a Security

Even though the misrepresentations and omissions on which the SEC bases its claims are not actionable, the SEC's claims for fraud under Section 10(b), Rule 10b-5, and Section 17(a) fail for the separate and independent reason that Mr. Jones did not make those statements and omissions in connection with the purchase or sale of a security. Section 10(b) and Rule 10b–5 cover fraud only "in connection with the *purchase or sale* of any security." 18 U.S.C. § 78j(b) (emphasis added); 17 C.F.R. § 240.10b–5. Fraud under Section 17(a) must occur "in the *offer* or *sale* of any securities." 15 U.S.C. § 77q(a) (emphasis added). Section 10(b) applies to both buyers and sellers, while Section 17(a) applies only to sellers. *Aaron*, 446 U.S. at 687. But courts tend to overlook these differences. *See SEC v. Washington Cnty. Util. Dist.*, 676 F.2d 218, 225 (6th Cir. 1982).

Section 10(b) "should be construed flexibly, not technically and restrictively." *SEC v. Zandford*, 535 U.S. 814, 819 (2002) (citations and quotations omitted). Consistent with this directive, the statutory "in connection with" language presents a "modest requirement." *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305 (6th Cir. 2009). It is enough that the fraud alleged coincided with a securities transaction. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006). But Section 10(b) "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)." *Zandford*, 535 U.S. at 820 (citing *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982)). In other words, there must be an actual purchase or sale of a security to support a claim for securities fraud. *Gaudin v. KDO Corp.*, 576 F.3d 708, 711 (6th Cir. 1978).

Here, the complaint merely recites the statutory language of Section 10(b) and Section 17(a) to allege fraud in connection with the sale or purchase of a security. (ECF No. 1, ¶¶ 67, 70, PageID #20–21.) The closest it comes is where the SEC traces the origins of FirstEnergy's involvement in the House Bill 6 scandal: FirstEnergy's 2016 Form 10-K filed in February 2017, reporting billions in losses due to its nuclear energy affiliate. (ECF No. 1, ¶ 19, PageID #6; ECF No. 16, PageID #178.) But this disclosure precedes the statements and omissions at issue by several years.

More proximate in time, the complaint alleges that "FirstEnergy's secret payments, and Jones's misrepresentations and omissions about them, would have been important to FirstEnergy's investors." (ECF No. 1, ¶ 54, PageID #16.) However, the complaint expressly makes this allegation about materiality. Even construed in

31

Plaintiff's favor as alleging material political contributions that expose a company and its executives to reputational harm and civil or criminal liability, the complaint fails to plead fraud in connection with the purchase or sale of securities as a matter of law. There are no allegations of any market activity or market manipulation based on these statements and omissions (which, as explained, constitute non-actionable soft information in any event).

Additionally, the SEC argues that the misrepresentations and omissions at issue occurred "around the time FirstEnergy, whose stock is listed on the New York Stock Exchange, issued securities in the form of share-based compensation. (*Id.*, PageID #181 (citing ECF No. 1, ¶¶ 12 & 65, PageID #4 & #65).) Just because a company's stock trades on an exchange does not make every statement or omission actionable. And the fact that Mr. Jones received restricted stock as compensation does not satisfy the "in connection with" requirement without more. (ECF No. 1, ¶ 65, PageID #19–20.) No allegation in the complaint makes this commonplace compensation arrangement actionable in this case.

Finally, the SEC relies on FirstEnergy's stock price dropping 34% in the days after the unsealing of the Householder indictment to support that the alleged fraud came in connection with the sale or purchase of securities. (ECF No. 16, PageID #178; ECF No. 16-2, PageID #242–43.) This argument also fails. A stock drop alone does not necessarily result from fraud. Indeed, a public corruption scandal surrounding important legislation for a company would cause that company's stock price to fall even in the absence of fraud. In that respect, the allegations in this case look like

32

those in *Twombly*.  There, the complaint alleged antitrust conspiracies.  Because the allegations were alternatively consistent with either a conspiracy or lawful parallel conduct, the Supreme Court held that the complaint failed to meet the Rule 8 pleading standard.  550 U.S. at 556–57.  Without more, parallel conduct does not suggest a conspiracy, and a conclusory allegation of an agreement did not raise the right to relief above the speculative level.  So too here.  Without more, the stock drop does not raise the right to relief above the speculative level.  And the complaint lacks more that meets even the basic Rule 8 pleading standard.

For these reasons, the SEC does not satisfy the requirement that actionable fraud occurred in connection with the offer, purchase, or sale of a security.  Therefore, the SEC fails to state a claim for securities fraud under Section 10(b) and Section 17(a).  In so determining, the Court is mindful to avoid expanding judicially created causes of action.  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 165–67 (2008).  Indeed, Section 10(b) "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation." *Zandford*, 535 U.S. at 820 (citing *Marine Bank*, 455 U.S. at 556).  On this score, Mr. Jones's actions might be criminally or civilly actionable in various other ways—but they are not under the securities laws.

\*     \*     \*

In opposing Defendant's motion to dismiss, throughout its arguments, the SEC relies heavily on a ruling from the Southern District of Ohio denying a motion to dismiss private securities litigation against FirstEnergy and certifying a class.  (ECF No. 16, PageID #152–53, #161–63, #170–71, #172–76 & #177–79; *see generally In re*

33

*FirstEnergy Corp. Sec. Litig.*, Nos. 2:20-cv-3785 & 2:20-cv-4287, 2022 WL 681320 (S.D. Ohio Mar. 7, 2022).)  These arguments suffer from a simple, fatal defect.  In that case, the allegations differ materially from those pled here.  For example, the complaint in the private securities fraud case alleged that FirstEnergy misled investors in connection with a May 16, 2017 proxy statement addressing the company's political activity and prospectuses involving certain notes, among other differences.  *Owens v. FirstEnergy Corp. (In re FirstEnergy Corp. Sec. Litig.)*, 149 F.4th at 598, 599.  Moreover, FirstEnergy used "inflated prices to issue $2.5 billion in stock and $2.5 billion in debt securities." *In re FirstEnergy Corp. Sec. Litig.*, 2022 WL 681320 at *3.  None of that is alleged here.  Because this case and the private securities class action involve different specific allegations, they require different analysis, and one does not dictate the outcome of the other.

## II.  Rule 13a-14, Rule 13b2-2(a), and Rule 13(b)(2)(B) (Count 3 and Count 4)

Under Rule 13a-14 of the Exchange Act of 1934, every issuer filing a periodic report containing financial statements must include personal certifications that the chief executive officer and chief financial officer sign.  17 C.F.R. § 240.13a-14.  The officers must personally certify that they have reviewed the report, that it contains no material misstatements or omissions, and that they are responsible for "designing, establishing, and maintaining internal controls over financial reporting." *Id.*

Under Rule 13b2-2(a) of the Exchange Act of 1934, directors and officers of issuers are prohibited from making a "materially false or misleading statement" or omitting "any material fact necessary" to prevent statements from being misleading to an accountant in connection with an "audit, review or examination of the financial

34

statements of the issuer" or "the preparation or filing of any document or report required to be filed with the Commission."  17 C.F.R. § 240.13b2-2(a).

Accordingly, Rule 13a-14 and Rule 13b2-2(a) turn on the same threshold issue: whether information was false or misleading.  But Rule 13a-14 concerns certifications while Rule 13b2-2(a) concerns statements.  17 C.F.R. §§ 240.13a-14 & 240.13b2-2(a).

### II.A.  False Certification

The SEC alleges that Mr. Jones's certification accompanying FirstEnergy's annual report for fiscal year 2019 was false and misleading.  (ECF No. 1, ¶¶ 59 & 77, PageID #17 & #22.)  As part of the 2019 Form 10-K, the SEC alleges that Mr. Jones falsely represented that he disclosed any fraud to the company's auditors.  In its entirety, the statement reads as follows:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):… any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(*Id.*, ¶ 57, PageID #17.)  The SEC alleges that these statements were false and misleading because, when he signed the certification, Mr. Jones knew about the 501(c)(4) payments and chose to hide them from the public by not including them in FirstEnergy's SEC filings.  (*Id.*, ¶ 58.)

Defendant contends that allegedly false certifications are not actionable under Rule 13a-14.  (ECF No. 12-1, PageID #112.)  Specifically, he argues that the Ninth Circuit's opinion in *SEC v. Jensen*, 835 F.3d 1100 (9th Cir. 2016), is not binding authority and that the "implicit truthfulness" requirement established in that case is

"inconsistent with the rule's text, history, and purpose." (*Id.*) In Defendant's view, because Rule 13a-14 does not contain a "truthfulness requirement," creating one is redundant; particularly because false statements are already actionable under other provisions of securities laws. (*Id.*, PageID #112–13.)

Federal securities laws "should be construed flexibly, not technically and restrictively." *Zandford*, 535 U.S. at 819 (citations and quotations omitted). Rule 13a-14 requires a company's officers to "certify" the accuracy of every report filed under Section 13(a), including Form 10-K financial reports, to ensure that they do not contain misrepresentations or omissions. 17 C.F.R. § 240.13a-14. The signing officers are also required to certify that, "based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading." 15 U.S.C. § 7241(a)(4).

To "certify" means to authenticate or verify in writing that something is true. *Certify*, Black's Law Dictionary (12th ed. 2024). Therefore, by definition, a corporate officer cannot certify a fact about which he has no knowledge or which he knows to be false. The signature is not a mere formality and should actually account for something. *See Jensen*, 835 F.3d at 1112 (first quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000), then *United States v. Gomez-Guitierrez*, 140 F.3d 287, 1289 (9th Cir. 1998)). Accordingly, under Rule 13a-14, a mere signature does not satisfy the certification requirement.

While the Sixth Circuit has not addressed the question whether the SEC can bring a free-standing claim under Rule 13a-14 against the officer of a public company who files a false certification, the weight of authority supports such a cause of action. *See Jensen*, F.3d at 1113; *SEC v. Geswein*, No. 5:10-cv-1235, 2011 WL 4541303, at *3 (N.D. Ohio Sept. 29, 2011); *SEC v. Brown*, 740 F. Supp. 2d 148, 164–65 (D.D.C. 2010); *SEC v. Taronis Techs., Inc.*, No. 8:22-cv-1939, 2023 WL 5625299, at *10–11 (M.D. Fla. Aug. 31, 2023); *SEC v. Winemaster*, 529 F. Supp. 3d 880, 926 (N.D. Ill. 2021).  The Court agrees with this weight of authority.  In the Court's view, Rule 13a-14 provides a cause of action not just for a failure to file but also for signing a certification for a submission containing false and misleading information.

Still, the SEC's allegations that the certification was false and misleading fail for other reasons.  A violation of Rule 13a-14 occurs only where the underlying certification is false or misleading.  17 C.F.R. § 240.13a-14.  As the Court already determined, the complaint fails to allege that Mr. Jones made an actionable misrepresentation or omission in connection with the purchase or sale of securities. Rightly or wrongly, the law does not require that an entity organized under Section 501(c)(4) disclose its donors.  Such "organizations are not legally obligated to publicly disclose the names of their donors or the amounts of the donations."  *NorCal*, 2016 WL 8202966, at *4.  Without such a formal requirement in the law, the SEC may not use a civil enforcement action to establish such a rule or base a claim on a person's knowledge of or participation in dark money donations.  In other words, Mr. Jones's knowledge of the payments does not state a claim for violation of the securities laws.

37

### II.B.  Auditor Fraud and GAAP

In Count 4, the SEC alleges that Mr. Jones was "aware of, and participated in, the scheme involving FirstEnergy's payments to Partners for Progress," which were "improperly recorded" in the company's 2019 financial statements.  (ECF No. 1, ¶ 82, PageID #23.)  Specifically, the payments to Partners for Progress should have been disclosed to FirstEnergy's accountants as payments to a "related party" under generally accepted accounting principles.  (*Id.*, ¶ 60, PageID #18.)  Defendant counters that the SEC fails to allege "particularized facts" that Partners for Progress was a "related party."  (ECF No. 12-1, PageID #114.)  Additionally, Defendant contends that the SEC's alleged violation of Rule 13b2-2(a) improperly relies on the "conclusory allegation" that Mr. Jones was aware of the fraud.  (*Id.*, PageID #116.)

Because the Court already determined that there were no actionable statements or omissions, analysis of this count turns on whether there was a GAAP violation under Accounting Standards Codification 850 regarding related-party disclosures.  GAAP encompasses a wide range of acceptable practices, not a "canonical set of rules."  *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 544 (1979).  Among those permissible accounting treatments, management chooses which to use.  *Id.*  In other words, GAAP generally supplies standards that require the exercise of judgment, not brightline rules.  Accordingly, a failure to follow GAAP alone is insufficient to state a claim under federal securities law.  *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999); *see also In re Software Toolworks Inc.,* 50 F.3d 615, 627 (9th Cir. 1994).

In any event, no transaction between Partners for Progress and FirstEnergy required disclosure.  The related-party disclosures standard requires a transaction between related parties, and the complaint does not allege one.  A transaction means a purchase, sale, the provision of services, a lease, borrowing, lending, providing a guarantee, or other similar activity.  *See* ACS § 850-10-05-4.  Nothing in the complaint alleges or even suggests such a financial arrangement between FirstEnergy and Partners for Progress, which was a 501(c)(4) entity used for political purposes.  For these reasons, the SEC fails to state a claim that Mr. Jones failed to disclose information to FirstEnergy's accountants.

### II.C.  Internal Controls

The SEC alleges that Mr. Jones "failed to design internal accounting controls." (ECF No. 1, ¶ 63, PageID #19.)  Because of this failure, Mr. Jones and FirstEnergy allegedly violated the company's business code of conduct and political activities policy.  (*Id.*, ¶¶ 61 & 62, PageID #18–19.)  In response, Defendant argues that the SEC alleges "no facts" regarding FirstEnergy's internal controls or how Mr. Jones's actions constituted a primary violation of Section 13(b)(2)(B).  (ECF No. 12-1, PageID #118.)

A violation of a business code of conduct or a corporate political activity policy is not independently actionable under federal securities law.  *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015).  Indeed, a corporate code of conduct is merely a "declaration of corporate aspirations."  *Id.*  And to "treat a corporate code of conduct as a statement of what a corporation will do, rather than what a corporation aspires to do, would turn the purpose of a code of conduct on its

head." *Id.* In short, the SEC cannot rest its securities fraud claims on the alleged violation of these internal policies. *In re Comshare Inc. Sec. Litig.*, 183 F.3d at 553 (quoting *San Leandro Emergency Med. Plan v. Philip Morris Cos.,* 75 F.3d 801, 813 (2d Cir.1996)).

That leaves the SEC's allegation that Mr. Jones failed to implement sufficiently effective internal controls to prevent its role in the House Bill 6 scandal—or, more accurately, to prevent the filing of the company's 2019 Form 10-K with false and misleading information (resulting from omission of appropriate disclosures about the company's political activities). Under Section 13(b)(2)(B) of the Exchange Act of 1934, every issuer of a class of securities registered under Section 78 must implement sufficiently robust internal controls. An issuer must:

> devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (1) transactions are executed in accordance with management's general or specific authorization, (2) transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets, (3) access to assets is permitted only in accordance with management's general or specific authorization, and (4) the recorded accountability for assets is compared with the existing assets at reasonable intervals, and appropriate action is taken with respect to any differences.

15 U.S.C. § 78m(b)(2)(B). But without an actionable misrepresentation or omission, this allegation fails to state a claim. Moreover, the complaint fails to make anything other than a conclusory allegation that Mr. Jones failed to design or implement sufficient internal controls. In this respect, the complaint does not comply with the basic Rule 8 pleading standard and fails to provide notice of the claim against which

Mr. Jones must defendant.  Accordingly, the SEC fails to state a claim under Rule 13a-14.

### III.    Aiding and Abetting (Count 5 and Count 6)

To state a claim for aiding and abetting securities fraud, the SEC must allege (1) FirstEnergy committed a securities law violation, (2) Mr. Jones knew that his role in the overall activity was improper, and (3) Mr. Jones "knowingly and substantially assisted in the violation.  *See Washington Cnty.*, 676 F.2d at 224 (citing *SEC v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974)).  Therefore, there must be a primary securities law violation, and the defendant must knowingly or recklessly provide substantial assistance to the primary violator.  15 U.S.C. § 78(t)(e).

#### III.A. Count 5

The SEC alleges that Mr. Jones is liable for aiding and abetting violations of Section 13(a), Section 20(e), Rule 12b-20, and Rule 13a-11.  (ECF No. 1, ¶¶ 85–91, PageID #24–25.)  Specifically, the SEC alleges that FirstEnergy filed a Form 8-K on July 23, 2020 that contained a press release in which Mr. Jones made various false and misleading statements.  In support, the complaint pleads that Mr. Jones stated his belief that FirstEnergy acted ethically:

> I believe that FirstEnergy acted ethically in this matter.  At no time did our support for Ohio's nuclear plants interfere with or supersede our ethical obligations to conduct our business properly.

(*Id.*, ¶ 42, PageID #12.)  In Count 5, the SEC relies only on Mr. Jones's statements attached to the Form 8-K as the basis for its aiding and abetting claims.  (*See id.*, ¶ 89, PageID #25.)  But the statements at issue in that filing are not actionable for the reasons already explained.

**III.B. Count 6**

Likewise, the SEC alleges that Mr. Jones is liable for aiding and abetting violations of Section 13(b)(2)(B) and Section 20(e). Specifically, the SEC alleges that FirstEnergy failed to establish and maintain internal accounting controls to prevent it from making the payments to Householder. (*Id.*, ¶ 94, PageID #26.) Further, Mr. Jones substantially assisted in failing to prevent payments to Householder by not establishing or maintaining internal accounting controls. (*Id.*, ¶ 95, PageID #26–27.) But without an actionable misrepresentation or omission, and because the complaint fails to make anything other than a conclusory allegation that Mr. Jones failed to design or implement sufficient internal controls, Count 6 also fails to state a claim.

*          *          *

Because the complaint fails to allege a primary violation of the federal securities laws by FirstEnergy, the SEC fails to state a claim against Mr. Jones in Count 5 and Count 6.

## CONCLUSION

Under current campaign finance laws, entities organized under Section 501(c)(4) do not have to disclose their donors. Through this civil enforcement action, the SEC effectively attempts to use the federal securities laws to enforce a disclosure regime where none presently exists. At bottom, even taking the allegations in the complaint as true and construing them in favor of the SEC, Mr. Jones might have done any number of things. But he did not commit securities fraud.

That does not mean the conduct of FirstEnergy and Mr. Jones was right, moral, or exemplary. It does not mean the House Bill 6 is (or is not) good public

42

policy.  Mr. Jones might even have other civil or criminal liability for his actions. Nothing in this ruling should be taken as expressing any view on those issues.  To the contrary, the Court previously made its views about FirstEnergy's conduct well known.  *See FirstEnergy Corp. v. Pircio*, No. 1:20-cv-1966, 2021 WL 1588705, at \*4 (N.D. Ohio Apr. 23, 2021) (expressing "grave concern" that FirstEnergy "used the Court to obstruct justice, engage in witness tampering, or otherwise interfere with ongoing criminal and civil investigations").  This case involves only the narrow legal question whether the SEC states a claim against Charles Jones for violations of the federal securities laws.  At least based on the allegations in this complaint, it did not.

For the foregoing reasons, the Court **GRANTS** Defendant's motion to dismiss (ECF No. 12).

**SO ORDERED.**

Dated:  June 27, 2026

J. Philip Calabrese
United States District Judge
Northern District of Ohio

43